---

In re RUOS.

(District Court, E. D. Pennsylvania.   February 27, 1908.)

No. 1,093.

1. WITNESSES—ATTORNEYS—PRIVILEGE.

An attorney's privilege only extends to confidential communications between him and his client, and does not entitle the attorney to refuse to identify documents which he has witnessed, nor to testify with reference to facts concerning which he obtained knowledge from third persons.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 50, Witnesses, §§ 759, 762.]

2. BANKRUPTCY—JURISDICTION OF REFEREE—RULINGS ON EVIDENCE.

Where, in a proceeding before a referee in bankruptcy, a question arises concerning the competency of a witness or the admissibility of evidence, the referee should decide the question in the first instance, and should not certify the question to the court until requested to do so in a proper manner.

In Bankruptcy.   On certificate of referee concerning refusal of witness to answer.

John C. Swartley and William Stuckert, for trustee.
Francis Shunk Brown and Webster Grim, for bankrupt.

J. B. McPHERSON, District Judge.   The question certified by the referee calls upon the court to determine whether the privilege that protects confidential communications between attorney and client justified the witness in refusing to answer certain questions that were asked during the course of his examination.   The referee has been engaged in an effort to discover the whereabouts of the bankrupt's estate, having been directed to examine the bankrupt and other witnesses for this purpose.   In order to understand the situation now presented, it is necessary to state briefly the facts out of which the controversy arises:  The bankrupt was a merchant, dealing (among other articles) in agricultural implements, and Adriance, Platt & Co. are manufacturers of such implements, who had made consignments thereof to the bankrupt as their agent or factor.   When the petition was filed and the adjudication was entered, in September, 1901, the bankrupt owed several thousand dollars upon this consignment account, and the consignors were pressing for payment.   The claim was in the hands of Thomas Ross, a member of the Bucks county bar, and he is the witness who has refused to answer the questions hereafter quoted, that were put to him by the counsel for the trustee. Other facts relevant to the present dispute are thus stated by the learned referee:

"Henry D. Ruos testified: That shortly after execution was issued against him on September 4, 1901, an agent from Adriance, Platt & Co. called on him and threatened him with arrest if he did not pay the money which was due them on a consignment account, amounting to about $6,000.   That on Sep-

tember 6 or 7, 1901, he consulted Robert M. Yardley, Esq. (now deceased), his counsel, in relation to the matter, and paid him (Yardley) the sum of $4,000 in cash 'for any thing that might turn up,' and told Mr. Yardley to use his own judgment about this money. This $4,000 was secured from the sales of his stock in the general course of business.

"That he was afterwards arrested at the instance of Adriance, Platt & Co., on the charge of embezzlement as consignee, and the case returned to court, but that he was not tried, and that the case had been settled. That after he had been arrested he did not tell Mr. Yardley to pay the money he had given him to his prosecuting creditors. That he does not know of his own knowledge what was done with this money, or if any of it was paid to Adriance, Platt & Co. in settlement of their claim against him. He was not called on afterwards to pay any more money to them, but that Mr. Yardley had subsequently told him 'it had been fixed,' and had given him to understand that the money he had given had been used in settlement of the criminal prosecution against him. The bankrupt also testified that the reason he did not present this evidence at former examinations was that Mr. Yardley had advised him not to say anything about it, inasmuch as the Adriance, Platt & Co. claim was a consignment account. The bankrupt's schedules withheld the information that he had placed the sum of $4,000 in Mr. Yardley's hands, which he says was done under advice of counsel.

"Joseph A. Ruos testified: That on or about September 8, 1901, a Mr. Pulsifer came to see him in relation to the account due from the bankrupt to Adriance, Platt & Co., and that he (Pulsifer) stated that unless the same was paid the bankrupt would be arrested. That on or about the day the bankrupt was arrested he told Mr. Yardley at his office what Pulsifer had told him and then Mr. Yardley went to his safe and gave him (Joseph A. Ruos) the sum of $3,900 in cash in an envelope, and told him the Adriance, Platt & Co. claim had better be settled. That he took the $3,900 and gave it to Mr. Brock, who sealed the envelope and placed it in a vault in the Doylestown National Bank. He subsequently consulted Henry Lear, Esq., who advised him that the Adriance, Platt & Co. claim or contract was a consignment account, and the money belonged to them. That a year or more afterwards he received the said envelope and money from Mr. Brock, and paid to Adriance, Platt & Co., or their representatives, between $3,000 and $3,500 of the $3,900, and retained the balance. He could not fix the exact amount that was paid or the time, other than it was some time after Henry D. Ruos had been declared a bankrupt. Questioned as to whether or not the Adriance, Platt & Co. claim had been assigned to him, he stated he did not know how the matter had been fixed, and refused to answer whether or not he received the first dividend on the bankrupt's estate on the Adriance, Platt & Co. claim.

"From this testimony it is evident that the bankrupt or his agents, a year or more after he had been adjudicated a bankrupt, disbursed $4,000 taken from his business, of which sum between $3,000 and $3,500 was paid in settlement of a claim and criminal prosecution against him, and that the balance, between $750 and $900, remains in the hands of Joseph A. Ruos. * * *

"In contradiction of the above testimony that the claim of Adriance, Platt & Co. was paid by the bankrupt, Mr. Stuckert, the attorney for the trustee, called George G. Mills, to show that he (Mills) settled the claim, and not the bankrupt; but the witness declared he never heard of this claim, did not pay any money in the purchase or settlement of the same, and disclaimed any knowledge in relation to the matter whatever. The attorney for the trustee thereupon called Thomas Ross, Esq., to prove that he (Ross) was the attorney for Adriance, Platt & Co., that as attorney the witness made a settlement of the claim after the bankrupt had been arrested, and that the sum of $3,150 was paid to Adriance, Platt & Co. in purchase of the claim. Mr. Ross refused to testify at all in relation to the matter because of his professional relation with Adriance, Platt & Co., and, after declining to answer the questions of Mr. Stuckert, the attorney for the trustee, Mr. Stuckert moved that the testimony of the witness be certified to this court for action thereupon to determine whether or not the said witness was guilty of contempt and should be compelled to answer, which motion was granted by the referee, and said question has been this day certified to the court for its opinion thereon."

In support of the theory that the bankrupt's money had been used to settle the claim—the name of one George G. Mills having been used as a mere cover—the two papers following were exhibited to Mr. Ross:

"Exhibit F.

"Doylestown, Pa., May 21, 1902.

"It is hereby agreed as follows:

"Adriance, Platt & Company agree to sell to George G. Mills their claim against Henry D. Ruos, bankrupt, consisting of two promissory notes and check aggregating five thousand five hundred and seventy-nine dollars and ninety-eight cents ($5,579.98) for the price or sum of three thousand one hundred and fifty dollars ($3,150). This sale is made without recourse to Adriance, Platt & Company.

"George G. Mills hereby agrees to buy said claim for the price aforesaid and pay for the same $1,500 in cash and the balance on or before September 1st, 1902, with lawful interest; the said Mills to execute a promissory note for the deferred payment. It is further agreed that the said Mills shall have the right to use the name of Adriance, Platt & Company in collecting any dividend in bankruptcy on said claim, protecting and indemnifying Adriance, Platt & Company from all liability for costs; or, if said Mills desires it, Adriance, Platt & Company, through their attorney, will collect any dividend in bankruptcy and pay same over to Mills without any counsel fee or charge for collection.

"Witness our hands and seals the day and year first aforesaid.

"Signed, sealed and delivered in the presence of (as to Pulsifer) Thos. Ross.

"Adriance, Platt & Co.     [Seal.]
"H. D. Pulsifer, Genl. Agt.
"————————.     [Seal.]

"Received May 21, 1902, of George G. Mills, fifteen hundred dollars, first payment on account of above contract as stipulated for.

"Adriance, Platt & Co.,
"H. D. Pulsifer, Genl. Agt.

"Received May 29, 1902, of George G. Mills, twelve hundred and fifty dollars on account of the amount mentioned in above agreement.

"Thos. Ross,
"Atty. for Adriance, Platt & Co.

"June 25, 1902, $400, balance principal of contract & $2. interest—$402 paid.
"Ross, Atty."

"Exhibit H.

"It is hereby stipulated and agreed that a general release executed and delivered by Joseph A. Ruos and Henry D. Ruos to Adriance, Platt & Co., dated the 24th day of September, 1902, does not affect the right of the said Joseph A. Ruos to receive from Adriance, Platt & Co. all dividends and sums of money received from the bankrupt estate of the said Henry D. Ruos on the claims of the said Adriance, Platt & Co. against the said Henry D. Ruos, in pursuance of a former agreement made between the said Joseph A. Ruos and the said Adriance, Platt & Co. All dividends and sums of money received by the said Adriance, Platt & Co. from the estate of Henry D. Ruos are to be paid over to the said Joseph A. Ruos as if the said general release above referred to had not been executed and delivered.

"Thos. Ross,
"Atty. for Adriance, Platt & Co.

"September 24, 1902."

A check of $418.35 (Exhibit I), dated June 25, 1902, to the order of Mr. Ross as attorney, in payment of a dividend awarded out of the bankrupt estate to Adriance, Platt & Co., and indorsed by Mr. Ross, was also offered, and it was proposed to ask whether he paid the money received upon the check to George G. Mills, or to Joseph A. Ruos, or to the bankrupt.

With these facts in mind, it is easy to appreciate the bearing of the following questions asked by counsel for the trustee, to all of which the witness refused to answer:

"How much money was paid to the Adriance-Platt people in the settlement of their claim?

"Did you receive any money in the settlement of that claim, and, if so, how much?

"Just look at that paper, Mr. Ross (Exhibit F shown witness). Mr. Ross, is that a paper that was executed in your presence?

"Is that your signature as a witness?

"Is that your signature to a receipt?

"Receipt dated May 29, 1902. Is that your signature to that receipt?

"Mr. Ross, I show you paper marked 'G,' and call your attention to a receipt of June 25, 1902, for $400 balance of principal and $2 interest—$402 paid Ross, attorney. Have you the original of that, or do you know where it is?

"Did you receive $400 on account of the claim of Adriance, Platt & Co. on June 25, 1902?

"Mr. Ross, I show you a paper marked 'H.' Is that your signature at the bottom of that paper?

"Mr. Ross, I want to show you a check (check marked 'I' shown witness). Is that your indorsement on that check?

"Did you receive upon that check the sum of $418.35 from the trustee, J. T. Search?

"Did you pay any money that you received on account of that check to George G. Mills, or to Henry D. Ruos, or to Joseph A. Ruos?

"Did you sign papers marked 'F' and 'H' as attorney for Adriance, Platt & Co.?"

The refusal of the witness is put upon the ground that to answer these questions would violate the professional confidence between his client and himself, and, of course, his refusal was proper, if such violation of confidence would result from his replies. But the witness cannot be permitted to decide this question for himself. As was said by Judge Dallas, speaking for the Court of Appeals, in People's Bank v. Brown, 112 Fed. 654, 50 C. C. A. 411 (7 Am. Bankr. Rep. 475):

"It is requisite that in every instance it shall be judically determined whether the particular communication in question be really privileged, and in order that such primary determination may be advisedly made it is indispensable that the court shall be apprised, through preliminary inquiry, of the characterizing circumstances. There is no presumption of privilege, and, although its allowance in a clear case may be founded upon the voluntary statement of the attorney that his knowledge of the fact about which he is asked to testify was acquired in professional confidence, yet wherever, as in this case, the circumstances suggest that the sufficiency of the grounds for that statement should be considered, it is the right of the opposing party to demand that the proponent of the privilege shall be submitted to such interrogation as may be necessary to test its validity. * * * The witness declines to answer, not after inquiry and adjudication by the court, but upon his own mere declaration that the matters to which his declination relates were privileged communications, and thus, both of the facts and the law, he constitutes himself the exclusive judge. The province of the court cannot be thus usurped. If it could be, it is obvious that the rule under consideration, which is designed to promote the administration of justice, might readily be used for its obstruction, and become in consequence too pernicious to be tolerated."

The facts reported by the referee enable the court to decide satisfactorily, I think, that the privilege pleaded by the witness does not

cover the matters about which he was interrogated. In speaking generally concerning the rule protecting confidential communications between attorney and client, I cannot do better than adopt the language of the court in People's Bank v. Brown, supra:

"This court has neither authority nor inclination to repudiate the rule which protects from exposure, unless with the client's consent, all communications between him and his counsel, made during the subsistence of that relation in reference to any matter respecting which the latter has been, and properly could be, professionally consulted. This rule was applied, apparently for the first time, in the case of Berd v. Lovelace, Cary, 88, and for three centuries at least it has been steadily upheld by the courts upon the ground that for the proper administration of the law the confidence which it encourages the client to repose in the attorney to whom he resorts for legal advice and assistance should upon all occasions be inviolable. But it has been forcibly and vehemently assailed (Bentham, Judicial Evidence, book 9, pt. 4, c. 5), and the suppression of evidence which it effects can be 'ified only when the limitations which restrict the scope of its operation are assiduously heeded."

How far the modern rule goes, and what are its proper limitations, will nowhere be found so lucidly set forth as in the fourth volume of Wigmore's admirable treatise on Evidence (1905), in section 2290 et seq. Here and there during the course of the long judicial discussion concerning the proper application of the rule, dicta may be found which may go so far as to cover such transactions between the attorney and third parties as are now under consideration; but I think no recent decision can be found which extends the privilege as the court is now asked to extend it. If any such definite ruling is to be discovered, it is likely to have been made in some early stage of the discussion. The ground upon which the rule has been rested for more than a century is the vital importance to the client that he should feel perfectly safe in disclosing the secrets of his case to his legal adviser. Protected by the privilege, he may be confident that (with few exceptions) whatever he may communicate cannot thereafter be used against him. Clearly this reason does not apply in a situation where the attorney becomes acquainted with facts from another source than his client. In no proper sense can he be said to have learned such facts from the confidential communications of his client, and it is only to such communications (speaking generally) that the rule applies. Abundant authority exists for these statements. For example, I may quote from Prof. Wigmore's treatise in section 2315:

"When the attorney is made a witness to attest the execution of a document (and not merely to draft it), there is no confidence contemplated, and therefore no privilege for the occasion when the attorney is called upon to fulfill the function thereby assumed. He cannot be an attesting witness and yet not attest. * * * Accordingly, it has always been held that an attorney who signs in attestation of a deed is compellable to testify."

And in section 2317:

"The privilege is designed to secure subjective freedom of mind for the client in seeking legal advice. It has no concern with other persons' freedom of mind, nor with the attorney's desire for secrecy in his conduct of a client's case. It is therefore not sufficient for the attorney, in invoking the privilege, to state that the information came somehow to him while acting for the client, nor that it came from some particular third person for the benefit of the client."

See, also, 1 Greenleaf on Evidence (Lewis' Ed.) § 244; 23 Amer. & Eng. Ency. of Law (2d Ed.) p. 71, par. 7n; Dierstein v. Schubkagel, 6 L. R. A. 481, note; Southwark, etc., Co. v. Quick, 9 Eng. Ruling Cases, note on page 595 et seq.; Bacon v. Frisbie, 80 N. Y. 394, 36 Am. Rep. 632, note; Randolph v. Quidnick Co. (C. C.) 23 Fed. 278; Edison, etc., Co. v. United States, etc., Co. (C. C.) 44 Fed. 298; and a recent and very elaborate note upon the whole subject, which will be found in 66 American State Reports (1899) at page 213. For present purposes, the following quotation from page 220 will be sufficient:

"An attorney called as a witness is bound to testify to any matters which come to his knowledge in any other way than through confidential communications from his client. His privilege does not extend to information derived from other sources than through his client, even while he is acting as an attorney. He must not disclose anything confided to him by his client, but he is bound to testify to any matter which in any other way has come to his knowledge." (Citing cases.)

The discussion need not be prolonged. If the foregoing statement of the rule and its limitations is correct, it is clear that none of the questions which the witness refused to answer was objectionable, and that the inquiry upon which the trustee proposed to enter was legitimate. None of the questions relates to any communication from Adriance, Platt & Co. to the witness, and, so far as the writings are concerned, it is somewhat difficult to understand upon what theory they could for a moment be supposed to be a confidential communication from a client to his legal adviser.

A word upon the practice before referees may be appropriate. Where a question arises concerning the competency of a witness or the admissibility of evidence, the referee should decide the point himself in the first instance, instead of turning the matter over to the court. It will be time enough to certify the question when he is asked to do so in a proper manner. Very often his ruling will be acquiesced in, and the delay of referring the dispute to the court will thus be avoided.

The witness is directed to answer the questions certified by the referee, and all similar questions concerning the settlement of the claim of Adriance, Platt & Co. against the bankrupt.