[Crim. No. 1918.   In Bank.—May 24, 1915.]

## Ex Parte GEORGE McDONOUGH, on Habeas Corpus.

ATTORNEY AND CLIENT—PRIVILEGED COMMUNICATION.—Where an attorney was retained to represent certain parties in all investigations as to their participation in certain alleged violations of the election laws, and was later employed to represent certain other parties as to their participation in the same violations, he cannot be compelled to testify as to who furnished the bail deposited by him for the second parties, or who employed him to represent them, the purpose being to implicate all the parties in the same transaction, without the consent of his clients so employing him. Such transactions constitute a privileged communication within the meaning of section 1881 of the Code of Civil Procedure.

APPLICATION for a Writ of Habeas Corpus.

The facts are stated in the opinion of the court.

A. L. Frick, and Burton Jackson Wyman, for Petitioner.

W. H. L. Hynes, District Attorney, and Walter J. Burpee, Chief Deputy District Attorney, for Respondent.

ANGELLOTTI, C. J.—Petitioner, an attorney at law, was retained by one Wooley and one Gorman to represent them as their attorney in connection with any and all investigations that were being made or that might be made as to their participation in certain alleged election frauds and violations of the election laws in Alameda County, claimed to have been committed in connection with the general primary election of August 25, 1914, and he has ever since been acting as their attorney in pursuance of such employment. Subsequent to such employment one Higgins, one Gale, and one Wiles were indicted by the grand jury of that county, charged with participation in said crimes alleged to have been committed in connection with such election. Petitioner appeared as the attorney of each of such men, and has ever since acted for them, having admittedly been employed to represent them. He deposited ten thousand dollars cash bail for the release of Higgins. Subsequently the grand jury of Alameda County, in the further investigation of said frauds and crimes, procured the attendance of petitioner as a witness, and while he has finally answered many questions put to him, he has steadily refused to answer such questions as these, viz.:

Q. Who employed you to represent Higgins et al.?

Q. Did Jack Woolley or Grant Gorman employ you to represent Higgins et al.?

Q. Did Jack Woolley or Grant Gorman furnish the $10,000 which you deposited as bail for Higgins?

Q. Who furnished the $10,000 deposited as bail for Higgins?

For his refusal to answer these questions after being ordered to do so by the superior court, petitioner has been adjudged guilty of contempt of court and ordered confined in the county jail of Alameda County until he does answer them.

Admittedly the purpose of the questions is to obtain evidence against Woolley and Gorman, by which they can be implicated as principals in the commission of the crimes for which Higgins et al. have been indicted, and to implicate them in the commission of the election frauds.

The court below found that all the allegations of petitioner's affidavits filed in the contempt proceedings are true. These affidavits averred substantially, among other things, the following: Each and every communication, either verbal, written, or by signs, which he had received from either Woolley or Gorman in any way, relating to or concerning or about the said frauds, or the charges on which Higgins et al. were indicted, or with reference to the defense or bail of either said Higgins or said Wiles or said Gale, were received by him as the attorney for said Woolley and as the attorney for said Gorman, and not otherwise. That the ten thousand dollars deposited as bail for Higgins was delivered to him by a client of his, which client had previously employed him to represent him, said client, in all investigations which were being or might be made of said client's conduct in connection with said alleged election frauds and in connection with Higgins et al., and to represent him in all matters and things growing out of the alleged election frauds in which it was or might be claimed that said client was implicated, and in any proceedings whereby it might be sought to ascertain whether the said client was connected with the commission of these crimes or not. That clients employed him to represent Higgins et al. and that these clients had previously employed him to represent them in connection with all charges which might be brought against them in connection with said frauds, and in reference to any claim that might be made that these clients had in any way been connected with these frauds, and that it was in connection with such employment by said clients to act as their attorney, and not otherwise, that these clients employed him to represent Higgins et al. That neither the unnamed clients nor Woolley nor Gorman consented to his testifying.

The question presented is whether the employment of petitioner by his clients to defend Higgins et al. and the furnishing by his clients of the sum of ten thousand dollars to bail out Higgins were matters concerning which he cannot testify without the consent of such clients. Section 1881 of the

Code of Civil Procedure provides: ''There are particular relations in which it is the policy of the law to encourage confidence and to preserve it inviolate; therefore, a person cannot be examined as a witness in the following cases: . . . 2. An attorney cannot, without the consent of his client, be examined as to any communication made by the client to him, or his advice given thereon in the course of professional employment.''

However desirable it may be to obtain proofs sufficient to insure the conviction of all persons who commit crimes of the character of those under investigation, and it will readily be conceded that it is most desirable, such proofs may not be obtained from those who are forbidden by our law to give them. In regard to the obligations of an attorney to his client in this respect, our statutes are very explicit, making it his duty ''to maintain inviolate the confidence, and at every peril to himself, to preserve the secrets of his client'' (Code Civ. Proc., sec. 282, subd. 5), and, in the section above quoted, prohibiting his examination as a witness, as therein stated. As said in *People* v. *Atkinson,* 40 Cal. 284: ''On principles of public policy, communications from a client to his attorney touching the subject-matter under investigation are privileged, and will not be allowed to be disclosed by the attorney, even though he be willing to do so.''

It is obvious, of course, that the sole purpose of the questions was to obtain from petitioner proof of admissions by a client to him, tending in some degree to show complicity on his part in the alleged crimes for which Higgins et al. had been indicted, made while he was acting as the attorney of such client in the very matter of said alleged crimes. Under the circumstances shown here, the questions could have no other purpose and the answers no other effect. It will at once be conceded that if this client had said to such attorney that he had aided and abetted Higgins et al. in the commission of the acts for which they had been indicted, under such circumstances of course as to preclude the idea that his statement was not confidential, the attorney could not be examined as a witness regarding such statement, in view of our law, without the consent of the client. To our minds there is absolutely no distinction in principle between such a case and that presented by the questions which it is here sought to compel petitioner to answer. The only differ-

ence is in the weight of the testimony as going to show such complicity on the part of the client, in the one case being a direct admission of such complicity, and in the other being an admission of interest from which, in the light of other circumstances, such complicity might reasonably be inferred.

It has been said that the word "Communication" as used in such provisions as our section 1881 of the Code of Civil Procedure, is not to be restricted to mere words uttered by the client, that looking back at the reason of the privilege it is seen to secure the client's freedom of mind in committing his affairs to the attorney's knowledge, and that acts, as well as words, may fall within the privilege. (See Wigmore on Evidence, sec. 2306; *State* v. *Dawson*, 90 Mo. 149, [1 S. W. 827; *Holden* v. *State*, 44 Tex. Crim. 382, [71 S. W. 600].) These statements, we are satisfied, are in accord with the reason of the rule, and we cannot doubt their correctness. The questions here called for "communications" from petitioner's client or clients to him. In view of the facts found by the lower court, it cannot here be doubted either that whatever information was conveyed to petitioner thereby, came to him from his clients in the ordinary course of his professional employment as such clients' attorney, or that there was nothing in the nature of the transaction or in matters extraneous thereto to rebut the presumption that the communications were confidential. (See *Hager* v. *Schindler*, 29 Cal. 67.) And there was nothing in the facts to warrant a conclusion that the evidence proposed to be thus adduced bore at all upon any intention or arrangement on the part of the client to perform some illegal act in the future, or the then actual doing of any such illegal act, as to which, it may be conceded, the rule would not apply, however injurious to the client the evidence might be. (See *United States* v. *Lee*, 107 Fed. 702.) There was nothing illegal or contrary to public policy in what it was proposed to show petitioner's clients had done in the way of employing petitioner to defend Higgins et al., or in furnishing the money to be used for the purpose of obtaining the release of Higgins on bail. As before suggested, it was simply being attempted to show by petitioner's testimony that the clients had made to him admissions from which, in the light of other circumstances, their guilt in the matter as to which petitioner was defending them, might be inferred.

We are unable to perceive any sufficient ground upon which it may be held that petitioner may be compelled, without his client's consent, to answer any of these questions. Counsel for the people rely, as to the questions directed to the identity of the persons who employed petitioner to defend Higgins et al., upon what has frequently been said to the effect that an attorney is not privileged from disclosing by whom he was employed. Ordinarily this is doubtless true. As is said by Wigmore in his work on evidence (sec. 2313), the identity of the attorney's client, or the name of the real party in interest, will seldom be a matter that can be held, under the law, to have been communicated in confidence. The mere fact of retaining an attorney to act as such is not ordinarily a matter occurring in the course of the confidential relation of attorney and client, but is something that precedes the establishment of that relation. (*Eickman* v. *Troll*, 29 Minn. 124, [12 N. W. 347].) Frequently, too, the fact of employment of an attorney by a certain person for a specific purpose is an element of the cause of action being asserted against such person in the matter under investigation. This is illustrated in the case of *White* v. *State*, 86 Ala. 69, [5 South, 674], and *Stanley* v. *Stanley*, 27 Wash. 570, [68 Pac. 187], cited by counsel for the people. In the first of these cases, White was charged with making a false claim against a railroad company for lost baggage, and evidence of an attorney, employed to present the claim and who presented it, as to his employment, was held admissible. The other case was an action for damages by a wife against her husband's parents for alienation of her husband's affection, and the testimony of an attorney that he was employed by the parents to bring an action for divorce on the part of the husband against the wife was held to be proper. As Mr. Wigmore says, much ought to depend on the circumstances of each case. The matter was discussed in *In re Shawmut Min. Co.*, 94 App. Div. 156, [87 N. Y. Supp. 1059], and it was substantially said that many cases holding that an attorney may be compelled to testify to his representation of some person as an attorney are based and decided upon the principle that the employment and communications were made for the purpose of enabling the attorney to perform acts which involved the rights of third parties, *who acted upon the faith of his attorneyship,* and that under such circumstances it

was entirely proper that the fact of attorneyship should be established. Of course, we have nothing of this kind here. The case of *United States* v. *Lee,* 107 Fed. 702, perhaps comes nearer to sustaining the claim of the attorneys for the people than any other case cited, but even that case is distinguishable in a material way. The grand jury was investigating the matter of the disappearance of Lee, who had become a fugitive from justice while under indictment and awaiting trial, and his attorney, who had appeared for him on the indictment, was compelled to testify as to the name of the person who had employed him to defend Lee, it appearing that some one other than Lee himself had employed him. As suggested, the grand jury was investigating the matter of his disappearance, and not the question of his guilt of the charge against him—was endeavoring to ascertain who, if anybody, was guilty of complicity in the flight of Lee, an illegal act occurring after the commission of the crime charged against Lee. Even as to this the district judge said that a question asked the attorney relative to the interest which his client had in the defense of Lee might involve a confidential communication from his client to himself and might therefore be improper. He further said: "If the client did have an interest and stated it to his counsel, the latter is not called upon to reveal it." But the judge thought that counsel could not state that he gained the information called for from a client and then leave that client mysterious, unknown and undefined, and that the court had a right to know that the client was actual flesh and blood, and "to demand identification *for the purpose at least of testing the statement which has been made* by the attorney who places before him the shield of this privilege." Of course, in view of the facts found by the trial court here, no such reason exists in this case. It is clear enough that none of the various reasons advanced in the authorities for the disclosure of the name of the client who employed the attorney is applicable here, in view of the circumstances of this case. We cannot escape the conclusion that, in view of the findings of the lower court, to require the petitioner to answer any of the questions as to the name of the client who employed him to defend Higgins et al. would be to require him to divulge a confidential communication made to him by a client in the course of his employment—a communication

tending to show, and, under the circumstances of this case, material only for the purpose of showing, an acknowledgment of guilt on the part of such client of the very offenses on account of which the attorney had been employed to defend him.

What we have said is also true as to the questions relative to the furnishing of the money deposited as bail for Higgins.

The petitioner is discharged from custody.

Sloss, J., Lorigan, J., Melvin, J., Henshaw, J., and Shaw, J., concurred.

LAWLOR J., dissenting.—I dissent.

In my opinion the judgment of contempt should be upheld.

There is in the commitment, and made a part thereof, a full record of the proceedings before the grand jury and the superior court, which includes the two affidavits each of A. K. P. Harmon, foreman of the grand jury, and the petitioner. This record merits a critical examination. I will consider the questions relating to employment and bail separately.

On the question of employment I will examine first whether the superior court found that before petitioner was employed to represent Higgins, Gale, and Wiles he had already been retained on behalf of the party or parties who so employed him, and in this connection the inquiry is apart from the question of the identity of such party or parties.

It was, of course, necessary for petitioner to show such order in the respective employments as a foundation for the claims of privilege, and he sought to show it in an indirect and, as I think, ineffective way.

In respect to Higgins and Gale it is alleged that he was employed *prior* to October 19th, and Wiles *prior* to November 16th, but there is a striking absence of any averment covering the exact date of his employment on behalf of the three men.

In regard to the date that he was retained by those who employed him to represent Higgins et al., it is plainly averred that Wooley and Gorman engaged him separately as their individual attorney on October 17th. There is, however, no allegation in terms that before petitioner was employed to act for Higgins et al. he had been retained by Woolley and

Gorman on their own account. But such prior employment is attempted to be established by several indirect averments. For instance, it is alleged that anything "which *may* have been said" to petitioner by either Woolley or Gorman about the cases against Higgins, Gale, and Wiles, or representing them, was communicated while the relation of attorney and client existed between Woolley and Gorman and petitioner, and not otherwise.

It is elsewhere averred that petitioner had been employed by "clients" of his, without stating their names or how many such clients there were. Then follows the direct allegation (which is absent from the averments wherein Woolley and Gorman are mentioned by name) that before the "clients" employed him on behalf of Higgins, Gale, and Wiles they employed him to represent them. And in succeeding paragraphs it is averred in sequence that Woolley and Gorman were and are "clients" of petitioner.

It was apparently intended to further supplement the suggestion of prior employment by Wooley and Gorman for themselves personally by the averments that ever since October 19th and November 16th, respectively, petitioner has represented the three men.

No liability of disclosure touching the question as to *who* employed him on behalf of Higgins et al. would have been incurred by stating *when* he was so employed.

Such jugglery with facts should not be tolerated, and especially as the direct averment on the point of time would not, as has been shown, have impaired the asserted claims of privilege so far as the identity of either Woolley or Gorman or the unnamed "clients" is concerned.

As to the legal effect of all the averments on this point it is proper to state that before pronouncing the judgment of contempt the superior court made the following general findings:

"The court finds that each and every averment in the affidavits filed with this court by A. K. P. Harmon and the said George McDonough, and made a part of this commitment, and each and every recital in the orders made thereon by this court, and made a part of this commitment, is and are true . . ."

It is the established law of this state that on *habeas corpus* the findings of fact of the superior court are binding on this

court. (*Ex parte Clark,* 110 Cal. 405, [42 Pac. 905]; *Ex parte Spencer,* 83 Cal. 460, [17 Am. St. Rep. 266, 23 Pac. 395]; *Ex parte Sternes,* 77 Cal. 156, [11 Am. St. Rep. 251, 19 Pac. 275], and *Ex parte Ah Men,* 77 Cal. 198, [11 Am. St. Rep. 263, 19 Pac. 380].)

The court made no findings of any specific fact otherwise than as above expressed or implied, and in the involved state of the evidentiary record it cannot even be conjectured what conclusion, if any, was reached on the question whether the relation of attorney and client existed between Woolley and Gorman and petitioner before he was employed to represent Higgins et al., and this question was vital to the claims of privilege, for, I repeat, if the relation had not been previously formed there could be no privilege.

It must be shown that the relation of attorney and client actually existed before any communication can have the sanctity of privilege. (40 Cyc. 2363-b; *Churchill* v. *Corker,* 25 Ga. 479; *Jennings* v. *Sturdevant,* 140 Ind. 641, [40 N. E. 61]; *State* v. *Smith,* 138 N. C. 700, [50 S. E. 859]; *Sharon* v. *Sharon,* 79 Cal. 633, [22 Pac. 26, 131]; *George* v. *Silva,* 68 Cal. 272, [9 Pac. 257].) In *State* v. *Smith,* the prisoner had made communications prior to the employment to one whom he claimed to be his attorney in fact. But the court overruled the objection and held that even if it had been shown that the recipient of the communication was an attorney at law at the time, "the prisoner could not deprive the state of such important evidence by 'retaining' the witness." The fact of employment is preliminary in its nature and is not involved by the rule of privilege.

It is clear that the petitioner had primary knowledge of the precise date of his employment on behalf of the three men, and his failure to allege the fact, and relying on ambiguous and indirect averments instead, may have led the court, under a familiar rule of evidence (Code Civ. Proc., sec. 2061, subds. 6 and 7), to find that there had been no such prior employment, for, in strictness, prior to October 19th or November 16th may be prior to October 17th. And, as already pointed out, fixing the exact date of the employment did not involve the main question as to *who* employed him. The allegation that "anything which *may have been said*" of course is not the equivalent of a statement that

anything was said. In this behalf I think the reference in the majority opinion to the subject that any communication petitioner "had received" is too strongly expressed. Nor has any attempt been made, except by suggestion, to establish identity between Woolley and Gorman and the unnamed "clients," notwithstanding the direct averment that Woolley and Gorman were "clients" of petitioner. Indeed, the court may have decided that there was no such identity. Nor, again, does the averment that ever since the indicated dates petitioner has represented Higgins et al. preclude the idea that he may have represented them prior to October 17th. Evidence of such equivocal import should have been ignored for every purpose, and in my opinion it cannot be availed of to annul the judgment of the superior court. It seems to me there is an evidentiary gap between the set of averments which refer to Woolley and Gorman by name and the allegations touching the unnamed "clients," and as neither is sufficient, in itself, by reason of vagueness, to cover the point of time, it cannot be held here that the superior court found the fact in favor of petitioner.

Tested by the averments of priority of employment, the crime of perjury could not be supported, if, as a matter of fact, petitioner was employed to represent Higgins et al. before October 17th.

Finally, if petitioner intended by circumlocutory averments to have the superior court assume or find that Woolley and Gorman were the "clients" referred to, then his assertions of privilege should not be further considered.

In my view, the superior court did not intend by its findings to hold that the petitioner met the burden of showing that the relation of attorney and client had previously existed between himself and those who employed him at the time he was retained to represent Higgins, Gale, and Wiles. But even if it must be held here that under the findings of the superior court the employment on behalf of Higgins et al. was after instead of before October 17th, the fact of the employment itself should have been divulged by the petitioner.

Following the findings, the superior court concludes "that none of the averments contained in any of the affidavits, or answer, filed by George McDonough, and made a part hereof, state facts sufficient to justify the refusal of the said

George McDonough to answer the questions hereinafter referred to, and no reason appears why the said George McDonough should not be compelled to answer such questions before the grand jury of Alameda County, and why he should not be punished for refusing to do so in contempt of an order of this court issued on the eighth day of December, A. D. 1914, and made a part thereof.''

The grand jury was organized on November 2d. Prior to October 19th the preceding grand jury had returned indictments against Free S. Beach and James Higgins for the crimes of forgery and violating section 113 of the Penal Code; Edward C. Wiles for perjury, false registration, fraudulent voting and falsification of a public record, and Charles L. Gale for forgery and violating the provisions of sections 46 and 113 of the Penal Code. What remained to investigate called for the faithful and diligent efforts of the grand jury and the district attorney. The initiatory affidavit of the foreman, referring to the first appearance of the petitioner before the grand jury, enumerates the foregoing indictments and avers ''that said matters and said criminal action and actions grew out of and were based upon certain fraudulent registration, voting, falsification of records and impersonation of voters that had been committed in the said county of Alameda on the 25th day of August, A. D. 1914, at the general primary election held pursuant to the provisions of the direct primary law; that said crimes and frauds against the elective franchise shows a general concerted plan, scheme and conspiracy . . .; that . . . said grand jury was investigating the above matters with a view of determining what person or persons planned and directed the execution of said frauds and crimes and who were in league and in conspiracy with the above-named defendants in the execution and perpetration of said election frauds and the above-mentioned crimes.''

The investigation, the petitioner was apprised by the district attorney, covered the range of offenses prescribed by chapter IV, part I of the Penal Code, which is devoted to crimes against the elective franchise, and embraces sections 40 to 64½, the latter making applicable to primary elections the provisions of the preceding twenty-four sections. In addition, as already appears, indictments had been found against Higgins and Gale for violations of section 113 of

the Penal Code, which relates to the stealing, destroying, mutilation, altering, falsifying and the like of records in the custody of a public officer.

It is averred by the petitioner on his information and belief that the inquiry concerning his employment on behalf of the three men was immaterial and irrelevant, and that the purpose of the district attorney in asking the questions was to implicate Woolley and Gorman and the so-called "clients."

Whether the court found in favor of these averments does not appear by any specific finding. But it is proper to consider in this connection, as well as with regard to the legal conclusions of the superior court, that a grand jury is an appendage of the superior court and its members officers thereof (*In re Gannon,* 69 Cal. 541, [11 Pac. 240] ; *Heard* v. *Pierce,* 8 Cush. (Mass.) 338, [54 Am. Dec. 757] ; that they are "persons specially invested with powers of a judicial nature" (Code Civ. Proc., title III, part I) ; and that "the grand jury must inquire into all public offenses committed or triable within the county and present them to the court by indictment." (Pen. Code, sec. 915.)

While the subject-matter of investigation by a grand jury must fall within the original jurisdiction of the superior court as to the grade of offenses, and the inquiry be clearly defined when the authority of the superior court is invoked by it to compel a witness to answer, yet, because of the inquisitorial nature of the powers of the grand jury, it is not requisite that the court shall be fully advised of the exact evidentiary import of the proposed evidence, nor that it shall be informed of every angle and turn of, or keep pace with the investigation, or who may be involved thereby. It must affirmatively appear, however, that the inquiry is within the general scope of the investigation and that the subject-matter thereof is not in excess of the cognizance of the grand jury.

A full investigation of the matters referred to in the affidavits of the foreman of the grand jury was of transcending importance to the public and to the administration of justice, for crimes of the character mentioned tend to sap the foundations of free government and subvert the will of the people in the exercise of their electoral rights. It is readily conceivable that the inquiry had many ramifications, a close

knowledge of which would properly be confined to the grand
jury and to the district attorney, and I cannot assent, there-
fore, to this statement in the prevailing opinion: ". . . It
is obvious, of course, that the sole purpose of the questions
was to obtain from petitioner proof of admissions by a client
to him, tending in some degree to show complicity on his
part in the alleged crimes for which Higgins et al. had
been indicted, made while he was acting as the attorney
of such client in the very matter of said alleged crimes . . ."
This excerpt assumes the existence of facts about which, as
I have shown, there is serious doubt.  But even if by "cli-
ent" is meant Woolley or Gorman, or both, or the unnamed
"clients," the fact of petitioner's employment on behalf of
Higgins et al. should have been divulged, whether the ques-
tions had the import alleged by petitioner or tended to the
effect described in the majority opinion.

The test as to whether a communication is privileged is not
the effect the disclosure may have either on the client or
the attorney, but whether the communication comes within
the rule of privilege, and this question must inevitably be
determined by the facts and circumstances of each particular
case.

The reasons calling for the identification of the client are
set forth in Wigmore on Evidence, section 2313, and I cannot
conceive of a criminal case where the privilege is urged that
the fundamental fact of employment may not be inquired
into.   The questions of employment and the privilege claimed
are in their essence interdependent, and each must be deter-
mined according to the accepted rules governing them.

The general doctrine of privileged communications is ex-
pressed in the following cases:

". . . There is no presumption of privilege, and though
its allowance may, in a clear case, be founded upon the vol-
untary statement of the attorney that his knowledge of the
fact of which he is asked to testify was acquired in profes-
sional confidence, yet wherever the circumstances suggest
that the sufficiency of the grounds of that statement should
be considered, it is the right of the opposing party to de-
mand that the proponent of the privilege shall be submitted
to such interrogation as may be necessary to test its validity."
(Jones on Evidence, sec. 748-a) ; *In re Ruos,* 159 Fed. 252;

*People's Bank of Buffalo* v. *Brown,* 112 Fed. 652, [50 C. C. A. 411] ; and *Hughes* v. *Boone,* 102 N. C. 160, [9 S. E. 286].)

". . . It was incumbent on the party who objected to the examination . . . to show that the communication was privileged . . ." (*Carroll* v. *Sprague,* 59 Cal. 659.)

"The burden is on the party seeking to suppress the evidence to show that it is within the terms of the statute." (*Sharon* v. *Sharon,* 79 Cal. 677, [22 Pac. 26, 131].)

"Authorities establish the rule that the attorney may be compelled to disclose the character in which the client employed him . . . It is further to be observed that as this rule has a tendency to prevent the full disclosure of the truth, it ought to be strictly construed." (*Satterlee* v. *Bliss,* 36 Cal. 508.)

"Whether or not the circumstances are such as to make the rule of privilege applicable in a particular case is a question for the court." (23 Am. & Eng. Ency. of Law, p. 71, citing cases.)

And ". . . as the rule of privilege has a tendency to prevent the full disclosure of the truth, it should be limited to cases which are strictly within the principle of the policy that gave birth to it." (Id., citing *Satterlee* v. *Bliss,* 36 Cal. 508, and other authorities.)

The general principle of privileged communications is laid down in Wigmore on Evidence, section 2285 (4) :

"The injury that would inure to the relation by the disclosure of the communications must be greater than the benefit thereby gained for the correct disposal of litigation." And see section 2332.

In *United States* v. *Lee,* 107 Fed. 704, referred to in the majority opinion, it is said :

"But it is thought that a counsel may not state that he gained the information called for from a client, and then leave that client mysterious, unknown, and undefined. The court has a right to know that the client whose secret is treasured is actual flesh and blood, and demand his identification for the purpose, at least, of testing the statement which has been made by the attorney who places before him the shield of this privilege."

The question arose there, as here, in an investigation before a grand jury, and in the light of the evidentiary record in the case at bar the language is peculiarly pertinent, since

the range of the questions touching the employment of petitioner on behalf of Higgins et al., was limited to the identity of the party or parties who so employed him, and did not call for a disclosure of any communication received after such employment was entered into.

I apprehend there is no division of opinion on the general subject of privileged communications. When the relation of attorney and client has been created, and the object of the employment is not in furtherance of any criminal or fraudulent purpose (Jones on Evidence, sec. 748; Wigmore on Evidence, sec. 2298) any communication made by one to the other ''during, in the course of, and for the purposes of such employment'' (Jones on Evidence, sec. 748–a) is privileged, and ''it is immaterial whether the client is or is not a party to the action in which the question is put to the legal adviser.''     (Id.)

It is the privilege of the client and not of the attorney, and the communication shall not be disclosed by the latter without the express consent of the former.

In determining in any case the pivotal question whether the relation of attorney and client had been created before the communication passed, the inquiry should be as broad as the necessities of the particular case in order to get at the truth of the matter.     And if the prior existence of the relation is not established, the communication lacks in privilege.

I shall assume again for the purposes of what is to follow that the superior court found that the relation of attorney and client existed at the time the petitioner was employed on behalf of Higgins et al. by ''clients''—Woolley and Gorman or others—whose secrets he is guarding by his refusal to testify, and now consider whether, as matter of law, upon the record of the proceedings from the superior court, the communications referring to the employment to represent the three men come within the rule of privilege.

My conclusion is that they do not, and this rests on two considerations: 1. That the fact of employment in criminal litigation is never privileged; and 2. That even if the privilege may attach to the fact of employment in criminal proceedings in some instances, yet under the peculiar circumstances shown by the record from the superior court not only the fact of employment but also the ''characterizing circumstances'' should be fully developed.

The question whether the fact of employment may always be inquired into in civil litigation whenever the claims of privilege are urged upon considerations affecting the rights of third parties, or otherwise, is not involved here. But I perceive no reason for any difference in the rule. It may be suggested, however, that the rights of the public are not so immediately concerned in civil as in criminal litigation, and hence in relation to crimes against the state there would, in my opinion, always be stronger reason for having the identity of the interested parties known.

I have pursued the subject at length in order to ascertain, if possible, the reasoning the superior court followed in the premises, for it found without qualification in favor of all the averments of fact and held nevertheless that petitioner had placed himself in contempt of its authority and it is our duty not to pronounce the judgment void except in the face of the strictest necessity.

In my examination of the law I found no case on the subject of contempt of court whose facts bear resemblance to those of the proceeding at bar, and it is because of the unusual state of the facts that I finally conclude the superior court made a finding on the entire evidentiary record—although it does not so specifically appear therein—to the effect that because of the peculiar circumstances surrounding the employment of petitioner on behalf of Higgins et al. the communications on the subject should not receive the sanction of privilege. I do not think the court could have reached any other conclusion.

According to the claims of the petitioner, before being retained for the three men he had been employed by certain "clients"—Woolley and Gorman or others—to represent them individually in any matter that might arise out of the election crimes and frauds. From certain averments in the affidavit of petitioner it was doubtless inferred by the court that the employment to represent the "clients" came as a result of prevalent rumors and articles that appeared in the public press tending to connect them with the crimes claimed to have been committed by Higgins et al. The employment for the three men followed. The purpose of that particular employment primarily, of course, was to defend the original "clients."

I have given particular attention to the record of the said proceedings, with a view of determining the conclusion the court must have reached in reference to the character of the services the petitioner was to perform for the three men. It readily occurs that under all the circumstances presented there might well be an adversity of interest between the two sets of clients, and, of course, if that were so, the law would not support the petitioner in attempting to represent both.

The court could not have done justice to the state, as well as to the petitioner, if it failed to keep in mind the common experience in the administration of criminal justice, that in relation to crimes involving conspiracy and confederation those who plan them remain in the background, while reckless tools are sent forth to do the actual work under promises of reward, protection, and defense. If exposure follows, the men who actually committed the criminal act are alone brought to the bar of justice. Then an attorney, chosen by the heads of the enterprise, appears to defend them. Deference is generally paid to appearances by having one attorney for each individual. If conviction follows, the leaders in the background are naturally anxious about the outcome. Will the district attorney be able to obtain confessions from the men already in the toils of the law, and, in that way, develop all the facts of the crime and reach out for the prime conspirators? In such circumstances the advantage of hiring an attorney to guide the criminals already in the clutches of the law can hardly be exaggerated. What would be the conception of duty on the part of an attorney who would, in such a situation, accept employment to represent the two sets of malefactors? This is not an unusual experience by any means, as every one familiar with criminal litigation is aware.

If the superior court applied the foregoing illustration to the strange facts and circumstances of this case, and then in judging petitioner's conduct reached the conclusion that Woolley and Gorman were original conspirators in the scheme to debauch the election, and Higgins et al. were merely tools to do the actual work, would it be expected, under any rule of law, that the communications in relation to the employment of petitioner on behalf of Higgins et al. should be held privileged? The inherent circumstances plainly suggest that there were two such classes of participants in the enterprise—

one in the conception and the other in the commission of the election crimes and frauds.

How are the interests of justice to be safeguarded if an attorney is permitted to form such divergent alliances? To illustrate: If, in the progress of the investigation or prosecution, it seemed to be for the mutual benefit of the state and the involved men that, upon considerations of mitigation or immunity, the latter make to the authorities disclosures covering the criminal enterprise to violate the election laws on a wholesale scale, would the petitioner be in a position to give disinterested advice to his clients in the open in the face of his personal employment for the "clients" in the dark?

If such practices are to be tolerated, then assuredly an attorney under the cover of his professional *status* could, with assurance of security, be guilty of conduct which would be reprehended by the law if committed by another.

An attorney is required to take the constitutional oath of office to faithfully discharge the duties of an attorney and counsellor at law to the best of his knowledge and ability (Code Civ. Proc., sec. 278), and his duties are prescribed by law (Code Civ. Proc., sec. 282), among which are: . . .

4. To employ, for the purpose of maintaining the cases confided to him, such means only as are consistent with truth, and never seek to mislead the judge or any judicial officer by an artifice or false statement of fact or law;

"5. To maintain inviolate the confidence, and at every peril to himself, to preserve the secrets of his client."

On the record here it is proper to inquire whose confidence would the petitioner maintain and whose secrets would be preserved?

It is idle to think that Woolley and Gorman or the "clients" employed petitioner on behalf of Higgins et al. simply for the purpose of securing an adequate defense for them, for the whole record is at war with any such suggestion. The superior court must have concluded that the real purpose was nearer to the individual anxieties of the original clients. If these reflections are warranted, then the petitioner was involved in a conflict of duty, in which, considering the circumstances of the employment, the interests of the three men would probably be subordinated to those of the others; and if this be so, the petitioner has doubtless been more concerned in the proceedings about the nature of his engagement

to represent Higgins et al. than he was over the prospect of the disclosure of the fact of the employment itself. If petitioner were retained by Woolley and Gorman or the unnamed clients to protect them at all hazards, then, in my opinion, he was not free to accept employment to represent the three men, and this points to the necessity of showing "the characterizing circumstances" in such a case. The dual employment is disturbing, no matter from what angle it may be viewed, and in such circumstances the law should frown upon the relation, for to sanction it is to leave the law weaker and to place a premium on unethical conduct, or something more serious. It is not to be held that the law is susceptible of such stultification.

No client, in the suggested situation of the petitioner's original "clients," is entitled to the services of an attorney for the collateral purpose indicated here, and an attorney should not be permitted to be so employed, and if he would guard his professional honor and standing, and value his own liberty, he would not be willing to be.

Upon the remaining question whether the petitioner should have been compelled to state the source from which he obtained the bail money, I am not free from doubt. The petitioner, we have seen, stated unequivocally that he had been employed separately by Woolley and Gorman on October 17th, and that before the "clients" engaged him for Higgins et al. they retained him for themselves. It was stipulated between petitioner and the district attorney that the bail money was deposited on October 19th.

If the court found that the "clients" were identical with Woolley and Gorman, and that petitioner was employed to represent Higgins prior to October 19th, then under the rule governing the findings of the superior court on *habeas corpus* it would be proper to conclude here that the bail was deposited for Higgins during the existence of the relation of attorney and client between him and the petitioner, and upon this theory the point as to how the employment was brought about would lose some of its importance when considered in connection with the question of bail. This view proceeds on the assumption that in regard to the bail, communications passed between petitioner and Higgins as well as the petitioner and the "clients" who furnished the bail. The depositing of bail by an attorney on behalf of his client in the

due course of employment would ordinarily be deemed a communication between attorney and client within the meaning of privilege, but there may be some question in this case whether the superior court found it was a communication for the "purposes of such employment."

However, as already stated, on the question of bail I entertain some doubt, which I shall resolve on the side of the petitioner. (*People* v. *Atkinson,* 40 Cal. 284.)

Applying the rule of decision on *habeas corpus* (*In re Shortridge,* 5 Cal. App. 371, [90 Pac. 478]), to the record and the law on the question of employment, I am of opinion that the writ should be dismissed and the petitioner remanded.