CAREL ROBINSON, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 24584.   Promulgated April 28, 1930.

*Jesse I. Miller, Esq.,* for the petitioner.
*Byron M. Coon, Esq.,* for the respondent.

OPINION.

LANSDON: In support of his appeal the petitioner urges the following propositions: (1) That the transfer of the assets by himself and associates to the Bermuda Coal Co. in exchange for which they received the stock which the Commissioner found resulted in a taxable gain to him, took place on June 14, 1922, the date of the first meeting of the board of directors, at which time they owned all of the capital stock of the corporation, and were in control of it, within the provisions of section 202(c)(3) of the Revenue Act of 1921; and that

under these circumstances the transaction gave rise to no taxable gain; (2) that, of the stock so issued in exchange of these interests, he received but 100 shares instead of 175 shares, as found by the Commissioner; and (3) that the market value of the stock received by him was not in excess of $47 per share, instead of $100, as found by the Commissioner. In respect to the first proposition, the respondent contends that the actual date of the transfer of petitioner's interests to the corporation was November 9, on which date the corporation by appropriate action accepted the offer theretofore submitted by the petitioner to sell these assets to it, and the deed conveying the legal title to them was delivered by petitioner; that on this latter date petitioner and his associates owned less than 80 per cent of the capital stock of the corporation and were, therefore, not in control of it within the meaning of section 202(c)(3). We then have for determination, first, which of these two dates was the one on which the rights and interests of the taxpayer in the assets exchanged for stock passed to the corporation and determined his right to receive the stock which was thereafter issued to him.

It is important first to consider the status of the petitioner as purchaser of these assets at the receiver's sale, and his relationship to his associates, who were equally interested therein at the time, as well as the corporation thereafter organized to take them over. The record shows that the petitioner bid this property in at the sale in accordance with a prearragned understanding between himself and associates, who were joint creditors of the corporation to the amount of $7,000; and, in so doing, he was acting for and in behalf of all of them. In these circumstances, the petitioner was the trustee for the other associates, and, as such, he was bound to hold the property to their use and benefit. *Griffin* v. *Schlenk*, 139 Ky. 523; *Payne* v. *McClure Lodge*, 115 S. W. 763; *Day* v. *Amburgey*, 147 Ky. 123; *Middleton* v. *Beasley*, 186 Ky. 252; *Doom* v. *Brown*, 147 Ky. 469; *Wilderman* v. *Crawford*, 142 Ky. 303. The record further shows that the day following the purchase of these assets, the petitioner and Stuart met at the mine and agreed upon the final plans that were to be followed in carrying into effect the purposes for which they purchased them. At this meeting it was agreed that a corporation was to be formed, the details of which were to be entrusted to the petitioner, for the purpose of acquiring and operating the mine. In consideration for the transfer of these assets to the corporation it was agreed that 380 shares of its capital stock should be divided among these associates in accordance with their respective interests in such properties. With this understanding, Stuart departed for New York, leaving the petitioner in possession of their property. Thereafter, on June 2, the petitioner, true to his trust, procured a

charter for their corporation, and on June 14, following, completed the formal organization. He also caused the corporation to indicate its possession of these assets by a formal entry of the lease in its minutes of the directors' meeting held on that date. As general manager, secretary and treasurer of the corporation, the petitioner expended its funds in improving these properties and sold stock to his friends upon the strength of such ownership being in the corporation.

Clearly, it would seem from these facts that the petitioner was the promoter of the Bermuda Coal Co. from its inception, and by reason of such relationship, a trust was cast upon him to hold the property entrusted to him for the use and benefit of such corporation. After the purchase of said property, under the facts here shown, the petitioner could not have conveyed it to the corporation he was forming under any other terms than those agreed upon between himself and his associates; more particularly, he could not have personally profited to any greater extent in the transactions than to receive the 175 shares of stock agreed upon. In declaring the rule governing promoters of corporations in dealing with their trust, the Appellate Court of Kentucky, in the case of *Paducah Land, Coal & Lumber Co.* v. *Mulholland*, 15 Ky. L. Rep. 22, said in part as follows:

The promoters of a corporation stand in a confidential relation, not only to each other, but to all who may subsequently become members of the corporation, *from the time they begin to promote the association,* and will be required to account for the profits made by the purchase of the property for the company, and its sale at an advance. (Italics supplied.)

Other jurisdictions, without exception, have approved of this doctrine in holdings of no uncertain terms, from and among which we quote the following:

A promoter cannot make a profit by advancing the price of land which he had offered to sell to the corporation after the enterprise is so far under way as to seem probable of success. *Rice's Appeal,* 79 Pa. 168.

It is an undoubted rule of law that where two or more persons associate themselves for the purpose of purchasing property, and one of them represents the others in the purchase, he cannot receive from his associates a greater sum for the property than that which he paid for it, even though the property may be worth a great deal more than the purchase price. The same rule applies against promoters of a corporation. *Emery* v. *Parrott,* 107 Mass. 95.

The promoter of a corporation, like its directors, is deemed to sustain towards the members of the company the relation of a trustee towards his *cestui que* trust. * * * This principle is undoubtedly applicable to promoters of a corporation not yet in *esse.* * * * *California-Calaveras Mining Co.* v. *Walls, et al.,* 170 Cal. 245, 149 Pac. 595. Citing *Thompson on Corporations,* Sec. 457, and *Burbank* v. *Dennis,* 101 Cal. 90.

To the same effect are the holdings in *Getty* v. *Devlin*, 70 N. Y. 504; *South Joplin Land Co.* v. *Case*, 104 Mo. 572; *Pittsburg Mining*

*Co.* v. *Spoon*, 74 Wis. 307; *Nester* v. *Gross*, 66 Minn. 371; *Chandler* v. *Bacon*, 30 Fed. 538; and *Dickerman* v. *Northern Trust Co.*, 176 U. S. 181.

In the last cited case the court, among other things, said, " The promoter is the agent of the corporation and subject to the disabilities of an ordinary agent."

In view of this relationship between the petitioner, his associates and the corporation, it is obvious that when he purchased the property on May 8 he did so as the agent and trustee for them and not himself, individually. Whatever interests or rights he acquired, therefore, in this property on said date were for and in behalf of his said beneficiaries. He, therefore, individually, owned no interest in such properties which he could later sell to the corporation had he so desired.

A situation in many points similar to that which obtained in this case was involved in the case of *Nester* v. *Gross*, *supra*. In the facts there, the defendant Gross was one of several organizers and promoters of a corporation, and its president and general manager from its inception. At a meeting of the associates prior to signing the articles of incorporation, it was agreed that the corporation " ought to own the site upon which its plant was to be located " and that Gross should make the purchase and take credit for the price upon his stock. Before the organization of the company was completed, Gross bought the property, paying the full purchase price out of his own funds, taking the deed in his own name and filing it of record. He later paid for his stock in full, and, as manager of the corporation, went into possession of the property, making improvements thereon at a cost of over $1,000. In the following year the corporation went into liquidation and its assets were sold by the receiver. After this sale, the purchaser of these assets learned for the first time that the title to the real estate was in the name of Gross, and sued for an accounting, alleging that, owing to the relationship which existed between Gross and the proposed corporation at the time of the purchase of this property, he (Gross) was bound, in equity, to hold it in trust for such corporation. The court sustained the contentions of the plaintiff, and, in discussion of the principle involved, among other things, said:

The important question in this case is, what was the character of the relation between Gross and the corporation, as to the site upon which its plant was erected—that is, the lot in question? Clearly, the relation was a fiduciary one. He was its agent to select and purchase a site for its plant. No other rational conclusion can be drawn from the facts found by the trial court. It is claimed, however, by defendant, that there was no fiduciary relation existing between Gross and the corporation, because the arrangement that he should purchase the site was made before the corporation was actually organized. It was competent for the corporation to adopt the preliminary

arrangement made by the proposed incorporators for acquiring a site for the corporation, so as to enable it to enter promptly upon the business for which it was organized, and when *it did so, with the express or implied assent of Gross, he sustained the same relation to the corporation that he did to his associate promoters and incorporators.* He accepted the agency and trust imposed upon him by the arrangement with the promoters, and proceeded to execute it by entering into negotiations for securing the site, * * * As its general manager he took possession of the lot for it, with its consent, as a site for its plant, and expended thousands of dollars of its money for the building, plant, and appurtenances on the lot, under its authority, before the corporation, or any officer or stockholder except himself, had any notice that the legal title to the lot was not in the corporation. * * *

* * * Now, the defendant Gross, by his conduct in putting the corporation into possess'on of the lot as a site for its plant, while sustaining a fiduciary relation to it, and concealing from it the fact that he had taken the title to the lot in his own name, and by erecting thereon, ostensibly for it, the building and plant, represented to the corporation that he had carried out his arrangement to purchase a site for it as a payment pro tanto on h's stock subscription, and that he was expending its money as its agent on its own lot, and not on his. And we hold, upon the plainest principles of justice, that he is bound by his representations, and that, in the character of a trustee ex maleficio, he holds the legal title to the lot for the corporation, or its grantee, the plaintiff, and must convey it to him on such terms as are equitable. * * * (Italics supplied.)

In the case of *Seymour* v. *Spring Forest Cemetery Association*, 144 N. Y. 333, eleven citizens of Binghamton, N. Y., acquired 30 acres of land for the purpose of conducting a cemetery as copartners. Later, they decided to incorporate and sell the property to the corporation for bonds. The new corporation took possession of the property and delivered its bonds to the former owners without any formal record being made of a transfer of the legal title of such property to it. Later, the corporation resisted payment of the bonds, pleading a failure in consideration in that it had never legally acquired the real estate from the holders. The court, in that case, sustained the bonds and held that in equity the title to the property was in the corporation, saying:

The fact that no formal resolution of purchase was produced from the minutes of the corporation does not prove that there was none, because the agreement to that effect preceded by a day or two, the actual filing of the corporate certificate, at least the corporation ratified the proposed contract; for it took possession of the property, used and has ever since held the same. It must, therefore, pay or its possession becomes a robbery.

In the present case there is no question of *mala fide* on the part of the petitioner in his office as promoter, since he has not taken or claimed for himself anything more than the 175 shares of stock agreed upon before they launched the corporation. However, the absence of a controversy between the petitioner and the corporation does not change his relationship to it, neither does it make him the beneficial owner of property which he bought as trustee for his

associates and the corporation. This interest, however denominated, was represented by his certificate of purchase from the receiver who accepted his bid and declared him to be the purchaser of the property on May 8. Under such certificate, he was delivered possession of the property which he, true to his trust, delivered to the corporation upon its organization, June 14, following. At this time, it is true, no formal deed could be made conveying the property to the corporation, since that must await a confirmation of the sale from the court. However, the equitable title to the property had passed to the petitioner upon his being declared the purchaser of the property and depositing the decretal sale bond; and it was this equitable title which *ipso facto* vested in the corporation when delivery was made as shown. The interest which the purchaser acquires under the laws of Kentucky at such a sale as was held in this case, the courts of that State have described as being *a vested equitable title to the land from the time of his purchase*. In discussing this interest, the Court of Appeals, in the case of *Hughes* v. *Swope*, 88 Ky. 254; 1 S. W. 394, said:

> While it is, in a sense, true that the purchaser at a decretal sale is a preferred bidder until confirmation by the court, which bid may be rejected by the court, for cause shown, at any time before confirmation, yet it is not true that he acquires no equities by his purchase. He does acquire a vested equitable title to the land from the time of his purchase until the confirmation, and by confirmation his title becomes perfect from the date of his purchase, etc. It is upon the ground that purchasers at decretal sales are invested with the equitable title to the land purchased from the date of sale until confirmation, that any damage done the property by reason of the destruction of the buildings upon it, or other deterioration of the property, between the time of sale and confirmation, must fall upon the purchasers.

It is clear then that the purchaser acquired vested rights in these assets on May 8, the beneficial interest of which vested in the corporation by operation of law when it completed its organization and took possession of them as a corporate body. At no time after that date could the petitioner do other than to hold the property for the benefit of the corporation; and at all times, after said date, he was obliged to execute a conveyance therefor to it, upon demand, for the consideration agreed upon, to wit, 380 shares of its capital stock, no more and no less. The rights of these parties and the corporation with reference to this property and the distribution of the capital stock in payment therefor were irrevocably fixed on June 14, 1922, when it organized and took formal possession, which we find to be the date upon which the rights of the petitioner to the 175 shares thereafter delivered to him vested.

The records of the corporation indicate that a proposal to sell these assets to the corporation was made by the petitioner on October 24, 1922, and accepted on November 9, following, but it is obvious

that these are mere corporate formalities and could in no way affect or change the rights of the parties that had theretofore become fixed months prior thereto. Neither the petitioner nor the corporation could change the rights of the former to demand and receive the capital stock agreed upon as the price of the property, nor that of the corporation to continue holding the same and to enforce a conveyance of the legal title at a proper time. These formalities then were mere surplusage and of no extra legal effect, more than to confirm that which had already been accomplished.

As to whether or not the petitioner and his associates were in control of the Bermuda Coal Co. on June 14, 1922, it would hardly seem necessary to discuss. No stock had been issued up to this date, but the entire issue of 1,000 shares, excepting 6 assigned to the two directors, was subscribed for by the petitioner, and no person other than these owned any interest whatever in the corporation. In these circumstances the control of this corporation at this state of its existence could hardly be open to question. It is also clear from the record that at this time the corporation owned no assets that could give value to its capital stock, other than these which the promoters turned over to it in exchange for the stock in question. The stock then had no greater value than the property for which it was exchanged and no taxable gain could, therefore, result from the transaction. We think the Commissioner correctly found that the petitioner received 175 shares of the capital stock of the Bermuda Coal Co. in exchange for his interests in the assets conveyed to it. However, this question is of no importance in view of our conclusions that no taxable gain resulted from the transaction, and the decision will therefore be in favor of the petitioner.

Reviewed by the Board.

*Decision will be entered for the petitioner, under Rule 50.*