[Crim. No. 2982. Fourth Dist., Div. One. Apr. 7, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. MICHAEL L. SULLIVAN, Defendant and Appellant.

James W. Tetley, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, Barry H. Lawrence and James L. Markman, Deputy Attorneys General, for Plaintiff and Respondent.

WHELAN, J.—Defendant appeals from a judgment imposing a prison sentence for burglary in the first degree as fixed by a verdict that also found defendant to have been armed with a deadly weapon at the time; pronouncement of judgment on a conviction of assault with a deadly weapon arising out of the same incident was withheld.

## EVIDENCE

On March 24, 1967, Paul Blake, with a companion, entered Anthony's Fish Grotto in La Mesa after the establishment had closed for the night. Blake's purpose was to get any money he might find in a gambling game he believed was going on.

The two men entered a dressing room in the establishment where five of the kitchen help were playing poker. A one dollar bill and some quarters were in view. Blake entered first, armed with a small, double-barreled derringer pistol; his companion behind him armed with a dark-colored Luger automatic pistol. The five employees were told to get on their hands and knees on the floor; Blake's companion showed how that should be done, said, "I'm not fooling," and manipulated the pistol so that an empty shell was ejected, which Blake picked up.

The two men left without taking any money or other property after Blake's companion had entered and come out from an adjoining room. In leaving, they attempted to secure the door from the outside, but the five men within finally opened it and reported the matter to the police.

The police stopped a car, in which were two men, but the employees of the restaurant said that neither of the men in the car was one of the gunmen.

Three of the five employees of Anthony's Fish Grotto in court identified defendant as the man who wielded the Luger. Each, separately, had, before defendant was taken into custody, selected, from among several photographs shown to the witnesses by the police, defendant's photograph as that of the man with the black pistol. After defendant was arrested, the three kitchen helpers, on May 4, 1967, picked him out in a lineup of six men as the wielder of the black pistol.

The trial commenced on August 31, 1967. On August 29, 1967, O'Brien, the investigating police detective, received information from a lawyer named Hegner that Hegner had obtained possession, through a claim check received from a client, of a box containing several handguns, among them a Luger. The Luger had found its way into the shop of a gun dealer, who had sold it to a man in Phoenix, Arizona, and placed it with American Express Company for carriage to the purchaser. When O'Brien talked to the dealer, the weapon was in transit from the shop of the dealer to the office of the express company. The dealer authorized O'Brien to retrieve the gun from the express company which O'Brien did. The three kitchen helpers said that the weapon so obtained was similar to that displayed to them by defendant.

Hegner found in the box containing the Luger two other pistols, one a derringer recognized by the three kitchen helpers as similar to the weapon held by Blake. He found in the box also a number of papers, including receipts, bearing defendant's name. Hegner had not seen defendant before he saw him in court when Hegner testified. Defendant was not the client for whom Hegner had obtained the box at a storage place and who had given the box and its contents to Hegner. Hegner did not give the name of his client, the court having ruled that he need not do so.

### CONTENTIONS ON APPEAL

Defendant states his contentions on appeal as follows:

"POINT I: It was error for the prosecuting attorney to call Paul Blake to testify.

"POINT II: It was error for the prosecuting attorney to comment on Paul Blake's refusal to answer.

"POINT III: It was error for the defense attorney to withdraw a question put to Paul Blake on cross-examination, and it was error for the Court not to compel an answer.

"Point IV: The defendant was denied a fair trial by the grossly inadequate representation by Gerald Mendell.

"Point V: It was error to allow John Murillo to be the Court interpreter at the preliminary hearing.

"Point VI: In this case in particular where an attorney had destroyed a vital alibi defense and where the defendant could not testify for himself in fear of section 788 of the Evidence Code the Court erred by not allowing the defendant to represent himself.

"Point VII: The arrest warrant was constitutionally invalid.

"Point VIII: As a point of law the defendant could not be convicted of the crime of Burglary as stated in the Information since the corpus delicti as stated in the Information was not established.

"Point IX: The trial court erred in refusing to compel disclosure of two material witnesses thereby denying the defendant a fair trial.

"Point X: The defendant was deprived of the right to counsel at a critical stage of the proceedings in violation of the Sixth Amendment.

"Point XI: The identification at the police line-up was tainted in that police procedures unfairly focused the witnesses' attention on the defendant thereby denying due process of law in violation of the Fourteenth Amendment.

"Point XII: The identification at the preliminary hearing was tainted in that police procedures unfairly focused the witnesses' attention on the defendant thereby denying due process of law in violation of the Fourteenth Amendment.

"Point XIII: The Luger automatic was illegally seized and should not have been received in evidence.

"Point XIV: The defendant was denied due process and a fair trial in violation of the Federal Sixth and Fourteenth Amendments in that the standards of jury selection is [sic] unfairly biased and does [sic] not reflect a true cross-section of the community.

"Point XV: The jury was instructed that a witness need not make a positive identification; as a result of the instruction defendant's guilt was not proved beyond a reasonable doubt.

"Point XVI: The defendant was denied due process of law in violation of the Fourth Amendment in that after an illegal arrest pursuant to an invalid arrest warrant and while thus illegally detained the defendant was required to partici-

pate in a police line-up which resulted in prejudicial identification evidence being introduced into evidence at trial.''

## FIRST, SECOND AND THIRD CONTENTIONS

Paul Blake testified as a prosecution witness that he entered Anthony's for the purpose of obtaining money by theft, accompanied by a companion armed with a Luger automatic, and being himself armed with a pistol; that he had not taken the money from the kitchen helpers because it was not enough to bother with; asked by the district attorney if his companion was Michael Sullivan he refused to answer the question. On cross-examination he refused to answer the same question, was ordered by the court to answer, and the question was then withdrawn without having been answered. Blake testified that he had pleaded guilty to the charge of assault with a deadly weapon arising out of the incident and had received a prison sentence which he was then serving.

█ Defendant asserts, without support from the record, that Blake pleaded guilty under an agreement that the district attorney would not call Blake to testify against Sullivan. If there were such an agreement, it might go to the question of Blake's right to withdraw his plea of guilty; so far as we know, however, there is no right of a third party beneficiary to complain of the breach of such an agreement.

Defendant assumes gratuitously that if Blake had answered the question whether defendant was Blake's companion, the answer would have been in the negative; he suggests that the district attorney held over Blake's head the threat of further prosecution on other charges if Blake had answered the question.

█ Again, on the basis that Blake would have answered the question in the negative, defendant argues that his trial counsel committed a tactical blunder in withdrawing the question put to Blake after the court had ordered it answered.

We consider it was equally likely that Blake would have answered the question in the affirmative; and that defense counsel, if he had not known what the answer would be, on balance considered an affirmative answer to be as likely as a negative one. He made a reasoned choice of alternatives.

█ Finally, defendant claims prejudicial misconduct of the district attorney when, in argument to the jury, he made a statement and the following sequence occurred.

''. . . Four witnesses who were present have testified and one of them refuses to tell you whether it was Mr. Sullivan

who was with him. That witness, Mr. Blake, is in a peculiar position. He is in prison. Whether he has a basis for any fears he might have about being a squealer or fink, or what might happen to him at the prison as a result, whether he has any basis for this—

"MR. TETLEY: I object to this line of argument. He is arguing regarding what a witness did not say on the refusal to answer the question, which cannot be held against this defendant.

"THE COURT: No, I don't believe it can be held against this defendant.

"MR. TETLEY: May the jury be asked to disregard that part?

"THE COURT: The jury will be admonished to disregard that part of the argument."

It appears that the district attorney did not argue that Blake was afraid of Sullivan specifically, and that the court declared that any fears Blake might have could not be laid at defendant's door.

None of the first three of defendant's contentions is valid.

### FOURTH AND SIXTH CONTENTIONS

Both of these contentions have to do with the right to effective counsel.

█ The original information was filed on June 6, 1967; defendant was arraigned on June 7, 1967. The minutes of that date show this: "Gerald S. Mendell retained counsel of record for arraignment only"; and in the same set of minutes, "Gerald S. Mendell, Esq. is appointed as counsel of record."

On July 14, 1967, Gerald S. Mendell and defendant joined in a motion that Mendell be relieved as counsel of record, which motion was granted.

The reporter's transcript shows that Mendell asked to be relieved because there was a possible conflict of interest since he represented Paul Blake also.

Defendant then expressly waived his right to counsel and rejected an offer of the court to appoint counsel to advise defendant.

On July 20, the court, of its own motion, appointed James W. Tetley to act as counsel for defendant; Tetley was trial counsel.

The minutes of July 20 contain an additional entry as follows: "Defendant is informed by the Court that all handwritten motions heretofore presented by the defendant are

denied and that the defendant should turn those matters over to Mr. Tetley for his use in preparing for trial.''

Defendant's brief makes a number of statements about Mendell that find no support in the record. Among other things, he states that he had retained Mendell as early as May 5; that he gave Mendell the names and addresses of alibi witnesses when the witnesses were still in the San Diego area; that Mendell did not do anything to find the witnesses. Defendant claims also that Mendell, at the preliminary hearing, knowingly permitted one John Murillo, said by defendant to be the state's agent, to act as interpreter for one or more of the Spanish-speaking kitchen helpers. Defendant also charges that Mendell obtained $100 for investigative fees and failed to use it.

We have no way of assessing the truth of all the statements made by defendant. Not only does he make direct statements in his brief as of matters of fact, but he has appended to it a purported copy of what is termed ''Letter Journal Addressed to Carol Ann Kauffman,'' purportedly written while defendant was in jail awaiting trial.

The ''letter-journal'' purportedly covers the date on which Mendell was relieved as counsel. It is at variance in many respects with the certified record on appeal; it purports to quote defendant, Mendell and the judge; Mendell is quoted as saying that Blake had pleaded guilty; that is not a part of the official reporter's transcript.

The ''letter-journal'' is of interest in other respects: Carol Ann Kauffman, the addressee of the ''letter-journal,'' is stated in the brief to have been the name of one of defendant's alibi witnesses given to Mendell; the ''letter-journal'' also contains these purported exchanges with the court:

''ME: . . . I feel that with Mr. Corbin or Mr. Mendell as my counsels, I am sure to end up in State Prison. And if I am going to State Prison I would rather go by my own efforts.

''JUDGE: You wish to act as your own counsel?

''ME: If necessary, yes.

''JUDGE: But Mr. Sullivan, you are not familiar with court procedures, are you?

''ME: No, sir, I am not.

''JUDGE: Wouldn't it be better if some attorney such as Mr. Corbin or Mr. Mendell was to help you with procedures . . . . ?

''ME: Yes, sir, it would.

''JUDGE: Wouldn't Mr. Corbin or Mr. Mendell be suitable?'

"ME: No, sir! I have no faith in Mr. Corbin or Mr. Mendell.

"JUDGE: The competence of Mr. Corbin or Mr. Mendell is up to the court to decide. This court is better qualified than you to decide these matters. Since both attorneys are registered members it is not up to you to instruct the court . . . !

"ME: In that case, I refuse counsel altogether."

There is also this statement to the purported addressee:

"I end up in control of the case and will probably blotch [*sic*] it. I really don't know anything about court procedures but would rather stand up in front of a jury and state simply that I am not guilty than to have an attorney for defense (?) as Mr. Corbin."[1]

The charge that Mendell failed to furnish effective representation is not supported by anything in the record and must be rejected. So far as Mendell's failure to use the $100 allowance for investigation, which seems to have been turned over to trial counsel, the transcript of July 14, 1967 contains the following:

"THE COURT: Have you retained an investigator?

"MR. MENDELL: I called up Mr. Stonebrook, and the defendant told me he was going to plead guilty, and then I called it off."

The gist of Contention VI seems to be this: Defendant felt that he could not take the witness stand because he would be impeached by his prior felony conviction; in appointing counsel, the court deprived defendant of his only opportunity to tell the jury that he was innocent, i.e., in arguing the case to the jury.

It seems clear from defendant's own manufactured version of the discussion with the court that defendant did not wish to waive his right to counsel unless he had to accept Mendell or Corbin (who apparently represented him in another prosecution going on at the same time); and that defendant was admittedly unable to handle his defense himself. The latter fact is borne out by defendant's apparent belief that he might present his denial of complicity in argument to the jury.

While the *pro se* brief of defendant indicates extensive reading of legal decisions and other legal material, a compari-

[1]The "letter-journal" was not before the trial court, and its contents may not be considered in deciding whether that court properly appointed trial counsel for defendant after he had waived his right to counsel. Since defendant has incorporated the "letter-journal" in his brief, it may be considered as argument on his part.

son of the style of the body of the brief with that of the letter-journal suggests the possibility that the preparation of the brief has been a work of collaboration. But whether or not the work of defendant alone, the brief does not establish that at the time of trial defendant was capable of conducting his own defense.

### Fifth Contention

■ It appears from the testimony that John Murillo was an employee of Anthony's Fish Grotto and supervisor of the kitchen helpers who testified in the trial.

Defendant states that Murillo was an agent of the state and acted as interpreter at the preliminary hearing, and in doing so conversed in Spanish with one of the witnesses who identified defendant. Defendant assumes, without evidence, that Murillo coached the witness in the matter of identification.

The charge that Mendell was at fault in not objecting to Murillo as interpreter is rejected as being wholly unsupported.

### Sixteenth and Seventeenth Contentions

■ Defendant states that the warrant under which he was arrested was issued without probable cause upon a hearsay affidavit of a police officer that did not state the facts upon which the officer based his conclusion that defendant had committed the crime.

Upon the basis of his arrest on an illegal warrant, he charges that the identifications made at the lineup that followed and were a consequence of the allegedly illegal arrest were tainted by the illegality.

Defendant charges also that while no objection was made in the court below, that was because of the ineptness of Mendell; he does not accuse his trial counsel of neglect in this regard.

There is nothing in the record on appeal to disclose the contents of the affidavit or complaint upon which a warrant was issued, or indeed to show that defendant was arrested under a warrant, or the circumstances of his arrest.

*People* v. *Sesslin,* 68 Cal.2d 418 [67 Cal.Rptr. 409, 439 P.2d 321], was concerned with the voluntariness of a consent to give and of giving handwriting exemplars while in illegal custody, the result of an illegal arrest under a search warrant issued upon an insufficient complaint.

Whether a police lineup calls for the consent of a defendant and whether, regardless of the necessity for consent, a police lineup could not be used to support an identification when the

defendant was illegally in custody are questions we need not answer because defendant's claim of an illegal arrest and of negligence on the part of counsel before trial lacks any support except defendant's statement.

## EIGHTH CONTENTION

■ Here defendant argues that there was no evidence to show the entry into the building was made with intent to commit theft, since the testimony of Paul Blake to that effect was uncorroborated and must be disregarded under section 1111, Penal Code.

Evidence of the intent necessary to prove the corpus delicti may be found in the circumstances that have been detailed. Where, after an unauthorized entry, theft has not been committed, the intent to commit theft may be gathered from circumstances. (*People* v. *Soto,* 53 Cal. 415; *People* v. *Daniels,* 145 Cal.App.2d 615 [302 P.2d 831] ; *People* v. *Johnson,* 146 Cal.App.2d 302 [303 P.2d 615] ; *People* v. *Hawkins,* 129 Cal. App. 720 [19 P.2d 249] [in none of which was there a theft or the displacement of any personal property] ; see also *People* v. *Jones,* 244 Cal.App.2d 378, 382 [52 Cal.Rptr. 924].)

The circumstances testified to by witnesses other than Blake sufficiently corroborated the testimony of Blake as to the intent with which entry was made, and would have been sufficient without Blake's testimony to support an inference that entry was made with intent to commit theft.

## NINTH CONTENTION

Having testified on direct examination that he had obtained the box containing three pistols and certain papers on which defendant's name appeared by presenting for the box a claim check given him by a client for whom he obtained the box, Hegner was asked whether he had ever before seen defendant and said he never had.

On cross-examination, Hegner stated that there were two clients who came in together and one in particular asked that the box be picked up. When asked who was the client for whom he obtained the box, Hegner claimed the attorney-client privilege, which was sustained by the court.

On redirect examination, Hegner said he understood there was to be $10,000 in the box but there was no money.

Defendant, arguing that the names of the two clients mentioned by Hegner should be disclosed, treats the matter as one

544

involving the discoverability of the name of an informer who gives information to the police on which they act.

There are dual grounds for discoverability of the identity of a police informer; one is to test the reasonableness of police action claimed to be taken upon the basis of information received from the informer; the other, dependent upon the nature of the information received, is to permit a defendant to discover possible witnesses whose testimony might be useful to the defense.

The injustice of refusing discovery to a defendant of the identity of one that might be a material witness on the issue of guilt arises largely from the fact that the withholding is by an agent of the state. In the present instance no objection was made by the district attorney to disclosure of the names of Hegner's clients. It was the witness who claimed the privilege; so that the element of state injustice is absent. There is nothing to indicate that any agent of the state knew the identity of either of Hegner's clients.

So far as the police are concerned here, their action was upon information from identified persons: Hegner; Schmidt, to whom Hegner sold the Luger; and the dealer who entrusted it to the express company.

As to the possibility that Hegner's clients might be able to give testimony favorable to defendant, certain observations may be made: Whoever had put together into the box the three weapons and papers bearing defendant's name could have explained how the contents of the box happened to be there, when and where they were put there; the person who delivered the box to the Greyhound bus as carrier could have testified when and where that was done and what was done with the claim check; and one or both of Hegner's clients could have testified how he or she came into possession of the claim check and from whom he or she obtained information as to when and where to call for the article represented by the check.

Since Hegner's clients had the false idea that the box contained $10,000, and were otherwise uninterested in its contents, which they abandoned in favor of Hegner, it is improbable that they had direct knowledge of its contents or how those contents were assembled, or when the box was delivered to the carrier.

But any such possible evidence is only as to a circumstance that linked together papers that probably came from defendant's possession with a Luger automatic and a derringer of

the types used in the burglary. It cannot be said in a case in which there was identification by three eye-witnesses that defendant was deprived of the names of material witnesses upon the issue of guilt.

It has not been established that the identity of an attorney's client is never privileged. In *Brunner* v. *Superior Court,* 51 Cal.2d 616 [335 P.2d 484], the actual holding was that the attorney-client relationship did not exist under the facts. The opinion stated as the general rule that an attorney is not privileged to withhold disclosing by whom he has been employed. (*Brunner* v. *Superior Court, supra,* 51 Cal.2d 616, 618.)

Under the circumstances existing in *Ex parte McDonough,* 170 Cal. 230 [149 P. 566, Ann.Cas. 1916E 327, L.R.A. 1916c 593], it was held that the privilege extended to non-disclosure of the client's name; when to declare the name might subject the client to prosecution for a crime that had been committed before the relationship arose.

In *Satterlee* v. *Bliss,* 36 Cal. 489, the testimony of an attorney as to who had employed him to commence a civil action brought in the name of a third person was received without objection in the court below. It was held that the privilege if any existed must have been claimed in the trial court. The Supreme Court said that the privilege did not exist with relation to the identity of the client.

A clear distinction has been made between disclosure of the identity of a client who has been the instigator of or an undisclosed principal in civil litigation and of a client who employs an attorney for some brief purpose not related to litigation. In the latter situation, Professor Wigmore's statement that much ought to depend upon the circumstances of each case seems valid. (8 Wigmore (McNaughton Revision) § 2313, p. 610.)

Such was the opinion in *Baird* v. *Koerner* (9th Cir. 1960) 279 F.2d 623, in which the claim of privilege was upheld in applying California law.

It is certainly conceivable that if Hegner's clients believed the box contained $10,000, they were parties to some criminal act with relation either to the claim check itself or the money. Such a sum honestly come by is rarely transmitted in such a fashion. If the clients were so involved, and if Hegner at the time he obtained the box was ignorant of its supposed contents, and there is nothing to show when he was told of the

suppositious $10,000, then a claim of privilege might properly have been sustained.

### Fourth, Eleventh and Twelfth Contentions

Those contentions all bear upon the fairness of the methods of identification of the defendant from photographs and from the police show-up.

 Defendant cites Justice Black's dissenting opinion in *Stovall* v. *Denno,* 388 U.S. 293 [18 L.Ed.2d 1199, 87 S.Ct. 1967], in support of his claim that the court erred in overruling objection by trial counsel to evidence as to identification of defendant in the police lineup made on the ground defendant then did not have the benefit of counsel.

The court properly overruled the objection because the lineup was held on May 4, 1967, therefore before the June 12 decisions of *United States* v. *Wade,* 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926]; *Gilbert* v. *California,* 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951]; and *Stovall* v. *Denno, supra,* 388 U.S. 293 [18 L.Ed.2d 1199, 87 S.Ct. 1967].

 Defendant in his brief delves into the recesses of his memory to portray a vivid picture of how the lineup was held, which is unsupported by anything in the record. He states that it is apparent from the photograph of the lineup that it was ''unnecessarily suggestive and conducive to irreparable mistaken identity.'' If, however, there is anything in the photograph that draws attention to defendant, it is the fact that he allowed his mouth to hang open and rolled his eyeballs upward when the picture was flashed. In all other respects it appears to be a picture of six men of approximately the same height and coloring and similarly clothed.

No one spoke to the witnesses during the lineup and no one pointed to anyone in the lineup. The lineup identifications were made by the witnesses separately.

One of the witnesses at the lineup, Montes, thereafter saw defendant at the preliminary hearing and there recognized him although defendant then wore a moustache and glasses, and was sitting outside the bar of the court when first seen.

The other two witnesses to identification, Martinez and Rodriguez, did not testify at the preliminary hearing, and did not see defendant there for they were kept out of the courtroom. Rodriguez, at the trial, said, ''I just saw a picture they showed us in an office,'' when asked if he had seen defendant at the preliminary hearing. Defendant asserts that tainted the identification at the preliminary hearing; Rodriguez' state-

ment does not say that Montes, who did see defendant at the preliminary hearing, was shown any picture there.

The three eyewitnesses to identification, in their testimony, made it clear that they remembered defendant from the night of the burglary. The evidence as to identification was straightforward and positive and was fairly obtained.

### THIRTEENTH CONTENTION

Defendant claims the Luger automatic retrieved from the express company was illegally seized. The testimony is that the automatic was entrusted to the express company by a dealer for delivery to a man in Arizona. The dealer authorized the police officer to get the pistol from the express company and authorized the express company to give it up, which it did voluntarily.

We do not know the terms of the contract under which the packaged pistol was entrusted to the express company by the dealer. Section 7303, Commercial Code, would permit the consignor, under certain circumstances, to countermand his original instructions. It might be inferred, if the carrier voluntarily surrendered the package upon the authority of the consignor, that the latter had such right. In any event, it was reasonable that the police officer should in good faith believe that the joint consent of the consignor and carrier that he take the weapon was a sufficient consent. Under the declaration of *People* v. *Gorg,* 45 Cal.2d 776 [291 P.2d 469], the action of the officer in taking possession of the weapon and opening the package that contained it was reasonable.[2]

### FOURTEENTH CONTENTION

Defendant makes a general attack upon the methods of selecting trial juries on a nation-wide basis. We say methods because there are undoubtedly variations among the several states as to the method of selection, grounds for exemption from service, disqualification, etc. Uniformity is perhaps impossible. All classes are not included among those eligible in California. Conviction of a felony disqualifies for jury service, and one so convicted on trial for another offense might claim that he was denied that ideal of a jury that included some with the same background as himself.

---

[2]We do not agree that *Stoner* v. *California,* 376 U.S. 483 [11 L.Ed.2d 856, 84 S.Ct. 889] overrules *Gorg* as suggested in *Lucero* v. *Donovan,* 354 F.2d 16, fn. 6. *Stoner* and *Gorg* are readily distinguishable in their differing facts supporting the good faith belief of a police officer in a third person's authority to give consent.

The claim that defendant was denied trial by a constitutionally chosen jury is unsupported.

### FIFTEENTH CONTENTION

 Defendant quotes a part of an instruction given by the court, claiming it permitted the jury to convict without being convinced beyond a reasonable doubt.

The entire instruction was as follows: "You are further instructed that the identifying witness need not identify the defendant as the perpetrator of the offense positively, and the testimony of a witness that the defendant resembles the perpetrator, or that he believes him to be the perpetrator, is sufficient, if from an examination of all the evidence you are convinced beyond a reasonable doubt that the defendant was the perpetrator of the crime with which he is charged."

The part quoted by defendant ends with the word "sufficient." The instruction as a whole is a correct statement of law.

### HISTORY OF THIS APPEAL

The relations of defendant with this court have had a pattern that suggests future claims of denial of right to counsel. We detail the history.

Notice of appeal was filed by defendant's trial counsel.

The record on appeal in this matter was filed November 28, 1967.

On January 16, 1968, defendant signed a substitution of attorneys, filed February 1, 1968, by which he substituted himself as attorney of record in place of James W. Tetley. The latter signed a consent to the substitution.

On February 1, 1968, the clerk of this court wrote defendant informing him of his right to appointed counsel and requesting to be informed if defendant wished an attorney. Defendant signed a statement saying, "I do not wish to have an attorney appointed."

Defendant's opening brief was filed on May 16, 1968; a supplement thereto was filed the same day.

On September 28, 1968, defendant wrote the court asking that an attorney be appointed to represent his case for the remainder of the appeal.

On October 2, 1968, James W. Tetley was appointed as counsel for appellant.

Respondent's brief having been filed on October 1, 1968, Tetley, on January 20, 1969, filed a supplemental brief to which respondent has filed a rejoinder.

Counsel on appeal at the time of oral argument presented with vigor the contentions made in the brief prepared by him. Judgment affirmed.

Brown (Gerald), P. J., and Coughlin, J., concurred.

A petition for a rehearing was denied April 16, 1969, and appellant's petition for a hearing by the Supreme Court was denied June 18, 1969.