[S.F. No. 23830. Nov. 30, 1979.]

RANDALL A. HAYS, as City Attorney, etc., et al.,
Plaintiffs, Cross-defendants and Respondents, v.
BARRY WOOD, as City Councilman, etc., Defendant,
Cross-complainant and Appellant;
FAIR POLITICAL PRACTICES COMMISSION,
Cross-defendant and Respondent.

COUNSEL

Barry Wood, in pro. per., and James W. Luther for Defendant, Cross-complainant and Appellant.

Robert P. Will, Carl Boronkay, Richard Paul Gerber, Herbert M. Rosenthal and Robert M. Sweet as Amici Curiae on behalf of Defendant, Cross-complainant and Appellant.

Evelle J. Younger, Attorney General, Iver E. Skjeie, Assistant Attorney General, John Gordnier and Floyd D. Shimomura, Deputy Attorneys General, for Plaintiffs, Cross-defendants and Respondents.

Daniel H. Lowenstein, Robert M. Stern, Lee C. Rosenthal, Natalie E. West and Michael J. Baker for Cross-defendant and Respondent.

Kenneth J. Guido, Jr., as Amicus Curiae on behalf of Plaintiffs, Cross-defendants and Respondents and Cross-defendant and Respondent.

OPINION

MANUEL, J.—This case involves a challenge to a portion of the Political Reform Act of 1974 (the Act). We are concerned with chapter 7 of the Act entitled "Conflicts of Interest," and examine, particularly, Government Code section 87207, subdivision (b) (2),[1] which in general requires those public officials who are also attorneys or brokers to disclose the names of clients if the official's income from any client is equal to or exceeds $1,000 in a calendar year. We uphold the statute in its general operation but set aside, as in violation of constitutional equal protection provisions, that portion thereof which establishes a special disclosure threshold for attorneys and brokers.

The broad policy of the chapter, as expressed in section 87100, prohibits any public official from knowingly participating in or influencing a governmental decision in which he has a financial interest. On the assumption that this policy is served by a public awareness of the financial interests of government officials, chapter 7 requires affected public officers to make annual disclosures of sources of income.

---

[1]Hereafter, all statutory references are to the Government Code unless otherwise indicated.

(§§ 87200, 87203.) Under section 87207, the required disclosures include information about the sources of both (1) personal income directly received by the official, and (2) his or her share of income received by "business entities" in which the official has an interest.

Specifically, subdivision (a) of section 87207 provides that, in all cases, an official's disclosure statement must (1) identify each source of direct personal "income" equal to or exceeding $250, or $25 if the income was a gift, (2) state whether the amount of "income" from that source exceeded $1,000 or $10,000, (3) describe the consideration for which the "income" was received and (4) in the case of a gift, set forth the amount and date of receipt. In addition, under subdivision (b), applicable to "income" from business enterprises, the statement must contain: "(1) The name, address, and a general description of the business activity of the business entity; [¶] (2) In the case of a business entity which provides *legal or brokerage services,* the name of every person who paid fees to the business entity if the the filer's pro rata share of fees from such person was equal to or greater than *one* thousand dollars ($1,000); [¶] (3) In the case of a business entity not covered by paragraph (2), the name of every person from whom the business entity received payments if the filer's pro rata share of gross receipts from such person was equal to or greater than *ten* thousand dollars ($10,000) during a calendar year." (Italics added.)

Defendant Barry Wood, an attorney in sole practice, assumed office as a City Councilman of the City of Ukiah on March 12, 1974. As an official covered by the Act, he filed annual disclosure statements covering the periods January 7, 1975, through March 12, 1975, and March 13, 1975, through March 9, 1976. Each statement complied substantially with the requirements of section 87200 et seq. However, with reference to subdivision (b) (2), defendant refused to disclose the names of clients who had paid him legal fees equaling or in excess of $1,000.[2]

Plaintiff, as Ukiah's city attorney, thereupon commenced this action to compel the disclosures required by section 87207, subdivision (b). Defendant's answer asserted that the names of his clients were privileged information. He also sought, by means of a cross-complaint for

[2]The trial court found as a fact that defendant had three clients during the first reporting period and five clients during the second reporting period who paid fees to his law practice equal to or greater than $1,000, and that defendant's representation of these clients involved two personal injury matters, two wrongful death cases, two Social Security disability cases, one probate case, and one retainer from a nonprofit corporation.

declaratory relief, to establish the unconstitutionality of the disclosure requirements. The trial court upheld the validity of the sections and directed disclosure. This appeal followed. Defendant renews his arguments that the challenged requirements are unnecessarily overbroad, impair the statutorily protected confidential relationship with his clients, and offend the equal protection clauses of the federal and state Constitutions.

### A. Overbreadth.

■ We first consider the contention of defendant and amici that the entire business income reporting scheme of section 87207, subdivision (b), is unnecessarily and unconstitutionally overbroad. As applied to *all* occupations, they suggest, the statutory provisions for disclosure by public officials of information about private income intrude too extensively into the political, privacy, and associational rights of public officials and their clients and customers. ■ It is well settled that the general operation of political disclosure laws (as distinct from the quantitatively different treatment of particular occupations hereafter discussed in connection with defendant's separate equal protection argument) sufficiently touches "fundamental" constitutional interests to invoke a "strict scrutiny" standard of overbreadth review. (*Buckley* v. *Valeo* (1976) 424 U.S. 1, 66 [46 L.Ed.2d 659, 714, 96 S.Ct. 612]; *City of Carmel-by-the-Sea* v. *Young* (1970) 2 Cal.3d 259, 262-263, 266-268 [85 Cal.Rptr. 1, 466 P.2d 225, 37 A.L.R.3d 1313]; see *County of Nevada* v. *MacMillen* (1974) 11 Cal.3d 662, 671 [114 Cal.Rptr. 345, 522 P.2d 1345].)

We are aided in our analysis by the *Nevada* and *City of Carmel* cases, *supra,* two earlier decisions in which we examined campaign laws similar to that herein presented. In each instance we inquired whether the financial disclosure provisions of the statutes in question were justified as constituting the narrowest possible means of discouraging political corruption, viewed in the light of their "chilling" effect on those seeking and holding public office.

In *City of Carmel, supra,* we considered the 1969 financial disclosure law (former §§ 3600-3704, hereafter the 1969 Act), and discussed the basic standards applicable to statutes of this nature. The 1969 Act required "every public officer" (§ 3700) and "each candidate" (§ 3702) for state or local public office to file, as a public record, a statement "describing the nature and extent" of each "investment" exceeding

$10,000 at the time of filing of the statement (other than personal residence or recreational property). (§ 3700.) While readily accepting the validity of public disclosure as an appropriate technique, we found that the statute therein presented was too broad. We said that the law "encompass[es] indiscriminately persons holding office in a statewide agency regardless of the nature or scope of activity of the agency, as well as those whose offices are local in nature. . . ." More importantly, we noted, "No effort is made to relate the disclosure to financial dealings or assets which might be expected to give rise to a conflict of interest; that is, to those having some rational connection with or bearing" upon the actual functions of the official or his agency. (2 Cal.3d at p. 269.) Rather, we observed, the 1969 Act covered, without distinction, *all* substantial commercial investments of the official, his spouse and children, regardless of their nature or location. We concluded that the law was not drawn as narrowly as possible to achieve its legitimate purpose and we invalidated it.

In 1973, the Legislature enacted a new disclosure statute designed to overcome the deficiencies of its predecessor. (§ 3600 et seq., superseded but not repealed by § 87100 et seq., hereafter the 1973 Act.) The 1973 Act applied only to candidates for, or incumbents of, certain designated high-level offices (§ 3700). As to those affected, it required disclosure of limited information about investments or real property in excess of $1,000, and of somewhat more detailed information, including identities, concerning each source of personal income (including gifts, loans, and business income) in excess of $250. Unlike the 1969 Act, the 1973 law did not require disclosure of the exact amounts of income or investment; rather, like the current Act, it called only for a statement whether each covered income or investment source exceeded $1,000 or $10,000. (*Ibid.*) Subdivision (c) of section 3700 provided that no such financial interest need be disclosed if it could not be "affected materially" by the official's public duties; under subdivision (d), only investments, income sources or property *within the official's jurisdiction* could be so affected.

In *County of Nevada* v. *MacMillen, supra,* 11 Cal.3d 662, we upheld the 1973 Act, finding that it sufficiently remedied the flaws which we had observed in the 1969 version. We stressed that the 1973 law went only so far as necessary to discourage actual and substantial conflicts of interest. In particular we noted that, compared with the earlier statute, it applied to a more limited group of high-level offices and required less specific information about the investments covered. Most significantly,

disclosure was required only as to those investments and sources of income which might actually be expected to influence the performance of official duty. (*Id.* at pp. 673-674.)

 We conclude that the present law is within the guidelines established by *City of Carmel* and *Nevada.* Like the 1973 law, application of the present Act is restricted to those designated high-level state and local offices which might reasonably be expected to have a substantial influence on public policy. With the few exceptions discussed below, the disclosure schemes of the two laws are similar. They seek appropriate information about the sources and general magnitude of financial interests which may give rise to conflicts of interest, but refrain from prying unnecessarily into their exact nature and amount.

As originally enacted, the current Act's definition of reportable "income" encompassed, with specified exceptions, "income of any nature from any source." (§ 82030, subd. (a).) Thus, it failed to include a provision crucial to our validation of the 1973 statute—a limitation to income with substantial potential for influence on public duties. Effective January 1, 1977, however, the section was amended to exclude "income received from any source outside the [official's] jurisdiction" if the entity constituting the income's source neither plans to do business nor has done business within the jurisdiction in the two years preceding the report. By so confining reportable "income," the amended Act adopts an objective standard of material relevance to actual conflict of interest similar to that which we approved in *Nevada.* (11 Cal.3d at pp. 669-670.)

 Noting that he held office from March 12, 1974, through December 31, 1976, defendant suggests the "saving" amendment does not apply to his prior tenure. We disagree. The relief plaintiff seeks is injunctive (see § 91003, subd. (a)). "'Relief by injunction operates in futuro, and the right to it must be determined as of the date of decision by an appellate court.'" (*White* v. *Davis* (1974) 13 Cal.3d 757, 773, fn. 8 [120 Cal.Rptr. 94, 533 P.2d 222], quoting from *American Fruit Growers* v. *Parker* (1943) 22 Cal.2d 513, 515 [140 P.2d 23]; see also *Cal-Dak Co.* v. *Sav-On Drugs, Inc.* (1953) 40 Cal.2d 492, 496-497 [254 P.2d 497].) The 1977 amendment applies to defendant.

 Unlike its predecessors, the current Act requires that disclosure of an official's income from business interests, when it exceeds a speci-

fied minimum, must include identification of the sources (e.g., customers and clients) from which the business entity itself received the income. (§ 87207, subd. (b).) Defendant and amici forcefully urge the intrusive nature and effect of such a provision.

Viewing the source requirement solely on the ground here advanced (and placing to one side for the moment the separate but related matters of privilege and equal protection) we find no basis for concluding that such a requirement necessarily results in unwarranted and unconstitutional intrusion into protected zones of privacy. On the contrary, we believe that inquiry into actual sources bears a demonstrable relation to the substantial governmental interests here involved. (See *Buckley* v. *Valeo, supra,* 424 U.S. 1, 66-67 [46 L.Ed.2d 659, 714-715].) It is after all the clients or customers of a business entity in which a public official has a substantial interest who present the greatest potential source of conflicting obligations and interests. Defendant and amici fail to persuade us that practical alternative means exist whereby the true sources of potential conflicts of interest may be revealed. Acknowledging, as we do, the public interest in avoiding such conflicts, and balancing that interest against the intrusion on recognized private rights, we do not find the statute invalid on grounds that it requires disclosure of the actual source of business income. As we noted in *Nevada,* "neither the right to privacy, nor the right to seek and hold public office, must inevitably prevail over the right of the public to an honest and impartial government." (11 Cal.3d at p. 672.)

The foregoing discussion has focused essentially on the public official's constitutional rights to privacy. Much of it has equal application, however, to the corresponding privacy rights of disclosed clients and customers. While the client or customer may not himself be in the public arena, his business or professional relationship with the official may well give rise to the opportunities for divided loyalties and a resulting potential for improper influence over the conduct of public affairs. Thus, again viewing the matter solely from the standpoint of unwarranted invasion of privacy, we conclude that the same considerations of public interest which we have previously recognized as justifying limited disclosure by the affected official also support the reciprocal but limited invasion of client or customer privacy.

We conclude for the foregoing reasons that the Act, viewed in its general aspect, does not constitute an unconstitutionally overbroad intrusion into protected zones of privacy and association. It remains,

however, for us to examine those aspects and features of the Act having particular application to public officials who, like defendant, are also *attorneys.* Our inquiry in this regard will extend to two matters: (1) whether the Act, through its requirement of source disclosure, operates to dilute or abrogate the attorney-client privilege, and (2) whether the markedly lower source-reporting threshold applicable to attorneys operates to deny them equal protection of the laws. We take up each of these matters in turn.

### B. *Privilege.*

We have concluded that the Act was not intended to and did not affect or dilute the attorney-client privilege (Evid. Code, §§ 950-962) or the attorney's duty to maintain and preserve the confidence of his clients (Bus. & Prof. Code, § 6068, subd. (e)). It is true, of course, that the Act became law at a date subsequent to the above-cited enactments. However, as was aptly stated in the similar case of *Sacramento Newspaper Guild* v. *Sacramento County Bd. of Suprs.* (1968) 263 Cal.App.2d 41 [62 Cal.Rptr. 819]: "The courts assume that in enacting a statute the Legislature was aware of existing, related laws and intended to maintain a consistent body of statutes. (*Stafford* v. *Realty Bond Service Corp.* (1952) 39 Cal.2d 797, 805 [249 P.2d 241]; *Lambert* v. *Conrad* (1960) 185 Cal.App.2d 85, 93 [8 Cal.Rptr. 56]; 1 Sutherland, Statutory Construction (3d ed.) § 2012, pp. 461-466.) Thus there is a presumption against repeals by implication; they will occur only where the two acts are so inconsistent that there is no possibility of concurrent operation, or where the later provision gives undebatable evidence of an intent to supersede the earlier; the courts are bound to maintain the integrity of both statutes if they may stand together. (*Warne* v. *Harkness* (1963) 60 Cal.2d 579, 588 [35 Cal.Rptr. 601, 387 P.2d 377]; *Penziner* v. *West American Finance Co.* (1937) 10 Cal.2d 160, 176 [74 P.2d 252]; *Smith* v. *Mathews* (1909) 155 Cal. 752, 758 [103 P. 199]; see *Williams* v. *Los Angeles Metropolitan Transit Authority* (1968) 68 Cal.2d 599, 603 [68 Cal.Rptr. 297, 440 P.2d 497].)" (263 Cal.App.2d at p. 54; see also *Fuentes* v. *Workers' Comp. Appeals Bd.* (1976) 16 Cal.3d 1, 7 [128 Cal.Rptr. 673, 547 P.2d 449], and cases there cited; *Consumers Union of U.S., Inc.* v. *California Milk Producers Advisory Bd.* (1978) 82 Cal.App.3d 433, 446 [147 Cal.Rptr. 265]; *Spencer* v. *G. A. MacDonald Constr. Co.* (1976) 63 Cal.App.3d 836, 851-852 [134 Cal.Rptr. 78]; *American Friends Service Committee* v. *Procunier* (1973) 33 Cal.App.3d 252, 260-261 [109 Cal.Rptr. 22]; *Cannon* v. *American Hydrocarbon Corp.* (1970) 4 Cal.App.3d 639, 648 [84

Cal.Rptr. 575].) ■ We here find neither that form of inherent inconsistency among the several statutory commands which would preclude their concurrent operation nor any evidence of an intent on the part of the Legislature to supersede, override, or alter the operation of the attorney-client privilege in cases involving source disclosure under the Act.

■ It is well established that the attorney-client privilege, designed to protect communications between them, does not ordinarily protect the client's identity. (*Brunner v. Superior Court* (1959) 51 Cal.2d 616, 618 [335 P.2d 484]; *Satterlee v. Bliss* (1869) 36 Cal. 489, 507.) A limited exception to this rule has been recognized, however, in cases wherein known facts concerning an attorney's representation of an anonymous client implicate the client in unlawful activities and disclosure of the client's name might serve to make the client the subject of official investigation or expose him to criminal or civil liability. (See *Ex parte McDonough* (1915) 170 Cal. 230, 236-237 [149 P. 566]; *People v. Sullivan* (1969) 271 Cal.App.2d 531, 545-546 [77 Cal.Rptr. 25]; *Baird v. Koerner* (9th Cir. 1960) 279 F.2d 623, 630; *In re Grand Jury Proceedings* (5th Cir. 1975) 517 F.2d 666, 670-671, and cases there collected.) ■ These principles, in our view, remain wholly applicable in cases such as that before us.

We note that the Fair Political Practices Commission (Commission), charged with enforcing the Act, has reached a similar conclusion. A recently adopted regulation (Cal. Admin. Code, tit. 2, § 18740) sets up a procedure by which an attorney-official (or any other official asserting that full compliance with the requirements of section 87207, subdivision (b) would result in the infringement of a recognized privilege) may seek an appropriate determination from the Commission. The Commission's order in such a proceeding is subject to judicial review. (§ 83120.) Insofar as here appears, this regulation provides ample protection against unwarranted infringement of the attorney-client privilege in matters of this kind. The Commission has here stipulated that the defendant may presently seek relief under the regulation even though it was adopted after the period of his incumbency.

We conclude from the foregoing that the subject provisions of the Act do not operate to infringe upon the attorney-client privilege or the attorney's duty to maintain and preserve the confidence of his clients.

## C. *Equal protection.*

█ We finally turn our attention to that feature of the Act which sets up a separate and markedly lower source-reporting threshold for those public officials who are attorneys and brokers. The distinction thus created, defendant and amici urge, is in violation of state and federal provisions guaranteeing equal protection of the laws. This is so, they argue, whether it be viewed under the standard of "strict scrutiny" reserved for the examination of classifications involving "suspect classes" or touching upon "fundamental interests" (see *People* v. *Olivas* (1976) 17 Cal.3d. 236, 243-244 [131 Cal.Rptr. 55, 551 P.2d 375], and cases there cited), or whether it be assessed under the less searching "rational relationship" standard. █ Respondents, on the other hand, argue strenuously that this is not a proper case for the application of "strict scrutiny"; viewed under the "traditional rational relationship" standard, they assert, the classification here involved is clearly within the bounds of proper legislative[3] judgment. Because we disagree with this latter assertion, we have no occasion to address the matter from the standpoint of "strict scrutiny."

The constitutional bedrock upon which all equal protection analysis rests is composed of the insistence upon a rational relationship between selected legislative ends and the means chosen to further or achieve them. █ This precept, and the reasons for its existence, have never found clearer expression than the words of Justice Robert Jackson, uttered 30 years ago. "I regard it as a salutary doctrine," Justice Jackson stated, "that cities, states and the Federal Government must exercise their powers so as not to discriminate between their inhabitants *except upon some reasonable differentiation fairly related to the object of regulation.* This equality is not merely abstract justice. The framers of the Constitution knew, and we should not forget today, that there is no

---

[3]The fact that the Act, of which the provision we here examine is a part, was adopted as an initiative measure does not affect its status as legislation. "By the enactment of initiative and referendum laws the people have simply withdrawn from the legislative body and reserved to themselves the right to exercise a part of their inherent *legislative* power." (*Dwyer* v. *City Council* (1927) 200 Cal. 505, 513 [253 P.932], italics added.) Statutes adopted by the initiative process are subject to the same measure of constitutional scrutiny as is applied to laws adopted by the normal legislative process. (See *Weaver* v. *Jordan* (1966) 64 Cal.2d 235, 241 [49 Cal.Rptr. 537, 411 P.2d 289]; *Wallace* v. *Zinman* (1927) 200 Cal. 585, 593-595 [254 P. 946, 62 A.L.R. 1341].) When in this opinion we speak in general terms of "legislation," "legislative body," or "legislative purpose," we do so in the inclusive sense here indicated.

more effective practical guaranty against arbitrary and unreasonable government than to require that the principles of law which officials would impose upon a minority must be imposed generally. Conversely, nothing opens the door to arbitrary action so effectively as to allow those officials to pick and choose only a few to whom they will apply legislation and.thus to escape the political retribution that might be visited upon them if larger numbers were affected. Courts can take no better measure to assure that laws will be just than to require that laws be equal in operation." (*Railway Express* v. *New York* (1949) 336 U.S. 106, 112-113 [93 L.Ed. 533, 540, 69 S.Ct. 463] (Jackson, J., conc.), italics added.) (See also *Werner* v. *Southern Cal. etc. Newspapers* (1950) 35 Cal.2d 121, 131-132 [216 P.2d 825, 13 A.L.R. 2d 252], discussed *post.*)

██ It is with these principles firmly in mind that we have undertaken to assess the classification here before us. In so doing our function is, as we have recently indicated, "to conduct 'a serious and genuine judicial inquiry into the correspondence between the classification and the legislative goals' [citation];..." (*Newland* v. *Board of Governors* (1977) 19 Cal.3d 705, 711 [139 Cal.Rptr. 620, 566 P.2d 254].) The most that we require of that correspondence is that it be *rational*—i.e. that, in the words of Justice Jackson, the classification be found to rest upon "some reasonable differentiation fairly related to the object of regulation." For reasons to be stated, we fail to discern the requisite rationality in the classification here adopted.

We first recapitulate briefly the substance of the classification which concerns us. Section 87203 provides as here relevant that any person holding a specified office shall each year file a statement disclosing his income. "Income" is defined by section 82030 to include "a pro rata share of any income of any [in-jurisdiction] business entity or trust in which the individual or spouse owns, directly, indirectly or beneficially, a 10-percent interest or greater." Section 87207 indicates the required contents of the income statement, subdivision (a) dealing with the reporting of income actually received by the filer and subdivision (b) dealing with the reporting of income received by a business entity in which the filer holds the requisite interest. The latter subdivision contains three paragraphs, the first of which simply requires that the filer provide the name, address, and a general description of the business activity of a business entity in which he holds the requisite interest. The remaining two paragraphs, however, create the classification which here

concerns us. Paragraph (2), relating to business entities which provide "legal or brokerage services," requires disclosure of the name of each person who paid "fees" to the entity "if the filer's pro rata share of fees from such person was equal to or greater than one thousand dollars ($1,000)." Paragraph (3), relating to *all other* business entities, requires disclosure of the name of each person who made "payments" to the entity "if the filer's pro rata share of gross receipts from such person was equal to or greater than ten thousand dollars ($10,000) during a calendar year." Thus, if we may equate the "fees" received by an entity providing legal or brokerage services with its "gross receipts," the two paragraphs in question set up a tenfold differential between the disclosure threshold relating to attorneys and brokers and that relating to all other business entities.[4]

In assessing the rationality of this classification we are first required to identify the goals or ends sought to be achieved or furthered by the Act in the area of present concern. Happily, we have not far to seek, for the Act itself contains a specific enumeration of its underlying purposes, among which is found the following: "(d) Assets and income of public officials which may be materially affected by their official actions should be disclosed...." (§ 81002, subd. (d).) Thus, it would appear, the issue is clear-cut: Does the classification here in question rest upon some ground of difference between the differentiated classes which bears a fair and reasonable relationship to the objective of insuring disclosure of income which may be materially affected by the official actions of the filing public official?

It is suggested that such a ground of difference is to be found in the various levels of profit margin inherent in various kinds of business activity. The argument, as we understand it, is as follows: The likelihood of conscious or unconscious bias in a public official in favor of one with whom he has business dealings is normally a function of the amount of benefit flowing to the official in terms of actual profits derived by him as a result of his business dealings with the particular customer or client. Thus the most nearly perfect system for the detection of such bias would be one directly relating to *profit*. Due to the administrative diffi-

---

[4]It is to be noted that we deal here with pro rata shares. Thus, for example, a large fee paid to a law partnership having many partners may not be subject to source-reporting at all—even though it is the efforts of the filing public official which have generated the fee. On the other hand a fee of $1,000 paid to a sole practitioner would be subject to source-reporting.

culties inherent in such a system, however, the Act approaches the matter *indirectly* by utilizing a standard based upon *gross receipts,* making adjustment for normal profit levels in the various kinds of affected entitites by means of a difference in reporting level. Respondents—presenting statistical data asserted to indicate that attorneys[5] realize a. net profit of from 45 to 60 percent of gross fees, as compared to a mere 1 to 10 percent of gross receipts on the part of business corporations—identify this as a ground of difference which wholly justifies the distinction in disclosure thresholds.

We see no need to question the accuracy of these figures, just as we see no need to dispute the statistical compilations presented by amicus State Bar of California with respect to certain other professions.[6] The statistical data simply emphasize and particularize what common knowledge recognizes to be true: that persons and entities whose business is the providing of professional *services* realize a substantially greater percentage of gross income as net profit than do persons and entities whose business is the manufacturing and sale of *goods and property,* whose gross receipts necessarily reflect the recapture of amounts expended for materials and acquisition. What we fail to perceive, however, is how this fact in any way justifies the selection of but two of the several professions having relatively high profit margins for the special treatment which results from the classification here in question.

What the foregoing demonstrates, we believe, is that respondents' effort to explain the classification before us on the basis of relative profit margin differentials does no more than shift the focus of inquiry from one distinction to another. Thus, if it be assumed for purposes of argument that such differentials would justify differing treatment of lawyers and brokers on the one hand and other "businessmen" (excluding other professionals) on the other, we are left with the distinction, implicit in the legislative scheme, between lawyers and brokers on the one hand

---

[5]No similar statistical data is presented with respect to brokers, no broker being a party to this action.

[6]The figures provided by amicus indicate in general that architects, engineers, and land surveyors realize a net profit of from 35 to 40 percent of gross income; certified public accountants, from 30 to 58 percent; physicians in general practice, an average of 59 percent; dentists, an average of 40 percent. No figures are provided by amicus for physicians in specialized practice.

and, on the other, persons and entities (such as the members of other professions) whose relative profit margin is comparable to theirs.

Respondents resist the suggested line of inquiry—which amounts to an examination of the so-called "underinclusive" aspect of the basic classification before us—on the basis of a long and venerable line of cases which, they assert, stand for the proposition that a legislative body, in addressing a particular problem area, need not attack all phases at once but rather is free to address each in its turn in accordance with perceived legislative priorities. (See, e.g., *Williamson* v. *Lee Optical Co.* (1955) 348 U.S. 483, 489 [99 L.Ed. 563, 573, 75 S.Ct. 461]; *West Coast Hotel Co.* v. *Parrish* (1937) 300 U.S. 379, 400 [81 L.Ed. 703, 713, 57 S.Ct. 578, 108 A.L.R. 1330]; *Werner* v. *Southern Cal. etc. Newspapers, supra,* 35 Cal.2d 121, 132-133.) ▉ ▉▉▉ As we develop below, however, we believe that respondents read these cases too broadly—at least insofar as they relate to the application of the equal protection provisions of our state Constitution. (Cal. Const., art. I, § 7; art. IV, § 16.)[7]

The above-cited case of *Werner* v. *Southern Cal. etc. Newspapers, supra,* which represents the definitive statement of the subject doctrine in this jurisdiction, makes it lucidly apparent that the legislative body, when it chooses to address a particular area of concern in less than comprehensive fashion by merely "striking the evil where it is felt most" (35 Cal.2d at p. 132) may not do so wholly at its whim. We were there concerned with an equal protection attack on Civil Code section 48a, which provides in general that one seeking damages for defamation by a newspaper or radio station may recover no more than special damages unless he makes a timely demand for correction; plaintiff urged that an unconstitutional classification resulted because those defamed by newspapers and radio stations were unreasonably denied rights accorded to those defamed by others. We disagree—first being careful to note, however, that the test to be applied was that which we apply here today,

---

[7]"[I]n the area of fundamental civil liberties—which includes...all protections of the California Declaration of Rights—we sit as a court of last resort, subject only to the qualification that our interpretations may not restrict the guarantees accorded the national citizenry under the federal charter. In such constitutional adjudication, our first referent is California law and the full panoply of rights Californians have come to expect as their due....'" (*Serrano* v. *Priest* (1976) 18 Cal.3d 728, 764 [135 Cal.Rptr. 345, 557 P.2d 929], quoting from *People* v. *Longwill* (1975) 14 Cal.3d 943, 951, fn. 4 [123 Cal.Rptr. 297, 538 P.2d 753]; see also other cases and authorities there cited.)

i.e., that of reasonable relationship to legislative purpose.[8] In response to the argument that the subject classification was "underinclusive" with respect to the asserted purpose—i.e., that of lessening the danger of excessive general damage awards in defamation actions—because only litigation against newspapers and radio stations was affected, we said: "The Legislature *could reasonably conclude* that defamation suits against newspapers and radio stations constituted *the most conspicuous example of the danger it sought to preclude*" in that they, "because of the business they are engaged in,...are the most frequent objects of defamation actions and...the danger of excessive damages in actions against them is greatest because of their reputed ability to pay." (35 Cal.2d at pp. 132-133, italics added.)

It is clear from the foregoing that the *Werner* case does not stand for the proposition here advanced. ▆▆ That case establishes, on the contrary, that when the legislative body proposes to address an area of concern in less than comprehensive fashion by "striking the evil where it is felt most" (*Id.,* at p. 132), its decision as to where to "strike" must have a rational basis in light of the legislative objectives. The same principle was expressed by the United States Supreme Court in *Rinaldi v. Yeager* (1966) 384 U.S. 305 [16 L.Ed.2d 577, 86 S.Ct. 627], when it stated, at pages 308-309 [16 L.Ed.2d at pages 579-580]: "The Equal Protection Clause requires more of a state law than nondiscriminatory application within a class it establishes. [Citation.] It also imposes a requirement of some rationality in the nature of the class singled out. To be sure, the constitutional demand is not a demand that a statute necessarily apply equally to all persons. 'The Constitution does not require things which are different in fact...to be treated in law as though they were the same.' [Citation.] Hence, legislation may impose special burdens upon defined classes in order to achieve permissible ends. But the Equal Protection Clause does require that, in defining a class subject to legislation, the distinctions that are drawn have 'some relevance to the purpose for which the classification is made.' [Citations.]"

▆▆ We conclude from the foregoing that whereas variations in relative profit margins among the various professions and businesses might well form the basis of a classification bearing a fair and reasonable relationship to the stated legislative objective, the classification here before us may not be justified on that basis. This classification is not

---

[8]In so doing, it should be noted, we relied significantly and extensively on language in the concurring opinion of Justice Jackson in the *Railway Express Agency* case, to which we have adverted above. (See 35 Cal.2d at pp. 131-132.)

between those having a relatively high profit margin and all others; rather it is between the members of two professions which fall among others in the former category, on the one hand, and all others—*including* others who share the characteristic of relatively high profit margin—on the other. Thus, applying the teaching of *Werner,* we are left with the question whether there exists a reasonable basis for the legislative body to conclude that the members of these professions made up "the most conspicuous example of the danger it sought to preclude" (35 Cal.2d at p. 132). Or, to restate the inquiry in terms of the general principles we have explained: Does there exist some ground of difference between attorneys and brokers on the one hand and all others similarly situated in terms of profit margin on the other which bears a fair and reasonable relationship to the stated legislative objective of insuring the disclosure of income which may be materially affected by the official actions of the filing public official?

Four such grounds of difference are suggested. It is first urged that the lawyer's[9] typical role in the private sector—which often includes the representation of private interests vis-a-vis government—renders it more likely that a potential conflict of interest will exist in any given case when a *lawyer* also serves in a public capacity than when persons employed in *other professions and businesses* having similar profit-percentage characteristics serve in a similar public capacity. We must confess, however, that the logic of this argument eludes us. Even if it be assumed for purposes of argument that the *proportion* of a lawyer's private clientele which might have interests in potential conflict with his public responsibilities is greater than the *proportion* of, for example, an architect's or an accountant's clientele having such interests, it is a great step from this assumption to suggest that the lawyer is for this reason the more likely to encounter a situation of potential conflict. What is conspicuously absent from the equation is the matter of volume. Thus, for example, suppose that a lawyer serving on a city council has 10 clients providing him with over $1,000 in fees each. On the same council sits an architect or accountant or physician having 25 such clients. Even if the probability of potential conflict within a given sample of clients is twice as high for the lawyer as for the other professional, more situations of potential conflict would be expected to occur with respect to the latter. This argument, in short, does not provide a

---

[9]The parties and amici focus their arguments on the case of attorneys rather than brokers. At this point we shall do the same, reserving any treatment of brokers for a later point in this opinion.

reasonable basis for setting one profession rather than the other aside for special treatment.

It is argued, however, that the unique nature of the lawyer's relationship with his client renders him peculiarly susceptible to conscious or unconscious bias when acting in a public capacity. Certain habits of loyalty, developed as a result of the confidential, personal, and relatively intense character of this relationship—together with the aspect of advocacy which is often present—may prove difficult to overcome when the lawyer shifts from his private to his public role; it is this danger, respondents assert, which renders special treatment appropriate. Again, however, we fail to perceive how these qualities of the attorney-client relationship can reasonably be said to set it apart as, in the words of *Werner,* "the most conspicuous example of the danger...sought to [be] preclude[d]." (35 Cal.2d, at p. 132.) The aspect of confidentiality is surely not unique to the attorney-client relationship; it is present as well in professional relationships entered into by physicians (see Evid. Code, § 990 et seq.), "psychotherapists"—which includes psychiatrists, licensed psychologists, licensed clinical social workers, school psychologists, and licensed marriage, family, and child counselors (see Evid. Code, § 1010 et seq.), and clergymen (see Evid. Code, § 1030 et seq.), as well as in the case of public employees exposed to certain kinds of "official information" (see Evid. Code, § 1040 et seq.). The relationship between attorney and client is certainly no more personal and intense than that between the client and many of the other professionals above named. As for the element of advocacy, it is not only present on occasion in other professional relationships (as when an accountant appears before the Franchise Tax Board on behalf of a client) but does not in our view constitute a ground of difference between attorneys and all other professionals which, viewed in the context of the legislative goals, could reasonably be said to justify setting them apart for special and markedly more onerous treatment.

The third ground of difference advanced relates to the customary practice of many lawyers of accepting retainers. Such payments, it is urged, are in some cases only loosely connected to services actually rendered, and thus constitute a unique device for channeling money in payment for public favors to lawyer public officials which is normally unavailable in the case of other occupational groups. Again, however, we fail to perceive a real difference in the asserted distinction. Disclosable "income" as defined by section 82030 includes any manner of receipt of money or something of value, "including but not limited to

any salary, wage, advance, payment, dividend, interest, rent, capital gain, return of capital, gift, including any gift of food or beverage, loan forgiveness or payment of indebtedness, discount in the price of anything of value unless the discount is available to members of the public without regard to official status, rebate, reimbursement for expenses, per diem, or contribution to an insurance or pension program paid by any person other than an employer, and including any community property interest in income of a spouse. ..." Presumably one wishing to exert improper influence on a public official through the medium of disguised payment for political favor may seek to do so in any number of ways. If he does so *directly* to the official, the latter is required to disclose the fact and the source if the amount or value involved is $250 or more ($25 or more in the case of a gift)—regardless of the profession or business of the public official in question. (§ 87207, subd. (a).) If he does so *indirectly,* however—through payment to a business entity in which the public official holds a 10 percent interest—the level of disclosure depends on the profession or business of the recipient: if the recipient is an attorney, declaration and disclosure must occur if his pro rata share is $1,000 or more, whereas if the recipient is employed in any other business or profession (including those adverted to above which have similar margins of profit), declaration and disclosure must occur only if his pro rata share is $10,000 or more. We are at a loss to understand how the retainer fee—the abuse of which simply constitutes one means among many for effecting a bribe (to speak plainly) to a public official—may be said to distinguish the attorney from all others in a manner which bears a fair and reasonable relationship to the relevant purpose of the Act. That purpose, as we have indicated, is to insure that income of a public official which may be "materially affected" by his official actions be disclosed. That purpose is not advanced in a manner consistent with equal protection when one profession is singled out for special treatment on the basis of the availability to him of a method of payment which is no more subject to abuse than any other which might be used to further illicit ends.

Finally respondents suggest that the classification here in question finds a rational basis on the ground of strengthening public confidence in the political process. This argument, as we understand it, rests upon the rather curious assertion that the public, seeing an attorney advocate a position in his role as public official, "may believe, more so than for persons in other professions," that he is really promoting the interests of a private client. In order to disabuse the public of this pernicious and misguided notion, we are advised, more stringent disclosure require-

ments have been placed upon the attorney. Suffice it for us to say in response to this argument that the principle applied by Caesar to his wife, while it has been adverted to in support of disclosure laws *in general* against constitutional attack (see *Buckley* v. *Valeo, supra*, 424 U.S. 1, 67 [46 L.Ed. 2d 659, 715]), in our view has no proper application to the examination of a classification providing significantly different standards of disclosure for members of different professions.

We have concluded for the foregoing reasons that the classification here in question, insofar as it relates to attorneys, fails to exhibit any fair and reasonable relationship to the stated legislative objective and therefore is in violation of the principles of equal protection embodied in our state and federal Constitutions. Although as we have indicated no broker is a party to this action, we believe it manifest from what we have said that the classification insofar as it relates to brokers must fail as well. While we agree that there may be good and adequate grounds for distinguishing, for example, a real estate broker from a real estate dealer (due to the profit margin differential resulting from the inclusion of recovered investment in the gross receipts of the latter), no grounds occur to us or have been suggested which would justify differentiating brokers from all others with a similar profit margin—such as real estate *salesmen* for example. In view of this we see no point in dealing with the classification piecemeal. We therefore hold that the classification before us, set forth in section 87207, subdivision (b) (2), is invalid both as applied to attorneys and as applied to brokers. In so doing, we leave the remainder of the section intact (see § 81015), subdivision (b) (3) to apply to all affected public officials regardless of business or profession. The disclosure as to personal sources of income will continue as provided by subdivision (a).

The judgment is reversed with directions to enter judgment in conformity with the views herein expressed.

Tobriner, J., Clark, J., and Richardson, J., concurred.

**MOSK, J.**—I concur in the judgment but I cannot subscribe to the majority's stilted equal protection analysis.

In my concurring opinion in *Hawkins* v. *Superior Court* (1978) 22 Cal.3d 584, 595 [150 Cal.Rptr. 435, 586 P.2d 916], I described the

two-tier system of reviewing equal protection claims as a rigid and arti-
ficial structure. The vice of the binary theory, I pointed out, is that it
applies either a standard that is virtually always met (the rational rela-
tionship test) or one that is almost never satisfied (the strict scrutiny
test). (*Id.* at p. 598.) Once the test is selected, the result of its applica-
tion is foreordained—a process that Justice Marshall has justly
condemned as "outdated and intellectually disingenuous" (*Beal* v. *Doe*
(1977) 432 U.S. 438, 457 [53 L.Ed.2d 464, 479, 97 S.Ct. 2366] (dis.
opn.)).

There are additional developments not discussed in *Hawkins*. (See a
study of Justice Stevens' critical views of the two-tier test in Comment,
*The Emerging Constitutional Jurisprudence of Justice Stevens* (1978)
46 U.Chi.L.Rev. 155, 206-217.) Justice Brennan writing for himself,
Justices White, Marshall and Blackmun, declared that the equal protec-
tion problem he saw in *University of California Regents* v. *Bakke*
(1978) 438 U.S. 265, 324 [57 L.Ed.2d 750, 792, 98 S.Ct. 2733], could
not be measured by either the strict scrutiny or the rational relationship
test and thus he applied an intermediate test. Now by current count no
less than five Supreme Court justices have on appropriate occasion
found that cases do "not fit neatly into our prior analytic framework."
(*Id.*, at p. 358 [57 L.Ed.2d at p. 814]). By some analyses the number is
higher.[1] The Idaho Supreme Court, in a thoughtful opinion by Justice
Shepard, also added an intermediate dimension to equal protection.
(*Jones* v. *State Board of Medicine* (1976) 97 Idaho 859 [555 P.2d 399,
410], cert. den. 431 U.S. 914 [53 L.Ed.2d 223, 97 S.Ct. 2173].)

In its initial stages, this case was a textbook illustration of the result-
orientation of the two-tier test of equal protection. The trial court em-
ployed a "rational basis" standard and·ruled the legislation valid. The
Court of Appeal measured the discriminatory legislation against the
"strict scrutiny" standard and, finding no compelling state interest to
justify the disparity between requirements imposed on attorneys and
brokers and those imposed on all other occupations, invalidated the

---

[1]The holding of Chief Justice Burger in *Reed* v. *Reed* (1971) 404 U.S. 71 [30
L.Ed.2d 225, 92 S.Ct. 251], has been viewed as an example of intensified scrutiny of
legislative *means* and a concomitant insistence that such means "must substantially
further legislative ends." (Gunther, *The Supreme Court—Foreword* (1972) 86 Harv.L.
Rev. 1, 20-34.) And in *Trimble* v. *Gordon* (1977) 430 U.S. 762, 767 [52 L.Ed.2d 31,
37, 97 S.Ct. 1459], Justice Powell adhered to the position that illegitimacy falls in a
"'realm of less than strictest scrutiny'" but the scrutiny applied "'is not a toothless
one.'"

statute. My *Hawkins* prophecy—select the test, select the result—was once again vindicated.

Now my colleagues revert to the rational relationship test and, curiously, find every conceivable justification for the act to be wholly irrational. That is a heavy indictment of a legislative measure adopted by the people of the state and found to be valid by an able trial court. That its underlying bases are at least arguable should immunize the measure from rational relationship attack. "It is not within the competency of the courts to arbitrate in such contrariety." (*Rast v. Van Deman & Lewis* (1916) 240 U.S. 342, 357 [60 L.Ed. 679, 687, 36 S.Ct. 370].)

My *Hawkins* concurrence proposed that we refine the current simplistic approach by applying a third, or intermediate, tier of equal protection analysis. As explained by Professor Tribe, "intermediate scrutiny has been triggered if important, though not necessarily 'fundamental' or 'preferred,' interests are at stake" or "if sensitive, although not necessarily suspect, criteria of classification are employed." (Tribe, American Constitutional Law (1978) pp. 1089-1090.)

Application of this intermediate level of scrutiny was urged because of my belief that "This wide chasm between levels of review is entirely unjustified, given the broad spectrum of rights and classifications that demand equal protection analysis." (*Hawkins,* at p. 602 of 22 Cal.3d.) In light of this spectrum, it is apparent that coherent judicial decisions are most effectively promoted by a focus on "such factors as the importance of the rights involved, the extent to which the classification at issue interfered with their exercise, and the significance of the state interests advanced in support of the classification." (*Id.* at p. 599.) Such a focus permits courts to discuss candidly the considerations that ultimately determine whether a statutory scheme will withstand equal protection challenge; it thereby avoids the use of artificial labels that may mask the true justifications for judicial decisions. (*Id.* at p. 598.)

Analysis of the interests at stake in this case illustrates the inadequacy of our rigid two-tiered approach to the equal protection clause. The Court of Appeal properly held attorneys and brokers are not a "suspect class" and for that reason do not trigger the strict scrutiny test. But in examining "the importance of the rights involved," it ruled that

the disclosure provisions affect the fundamental right of privacy and the right to seek office, relying on *City of Carmel-by-the-Sea* v. *Young* (1970) 2 Cal.3d 259 [85 Cal.Rptr. 1, 466 P.2d 225, 37 A.L.R.3d 1313], and for that reason it applied the typically fatal strict scrutiny standard. By contrast, the majority here sidestep a strict scrutiny analysis and descend, as if there were no other alternative, to what Justice Marshall recently referred to as "the glancing oversight of the rational-basis test." (*Vance* v. *Bradley* (1979) 440 U.S. 93, 115 [59 L.Ed.2d 171, 187, 99 S.Ct. 939] (dis. opn.).)

I doubt that rights so fundamental as to require strict scrutiny are involved here. No serious contention is made that public officials should not be required to report details of income that exceeds $10,000. For such sums, all persons are treated equally. The objection is to singling out lawyers and brokers[2] and as to them alone requiring disclosure of income over $1,000. Thus the vice of the unequal statutory command is not qualitative but quantitative discrimination, and thus lacks the fundamental nature to compel strict scrutiny. It does not follow, however, that the rights at stake should *ipse dixit* be declared so unimportant that they are subject merely to the minimal judicial scrutiny of the rational basis test, even if they are found by the present majority to be irrationally affected.

We should determine the constitutionality of the statutory classification in this case by considering the rights involved and the classification's impairment thereof in light of the state interests advanced in its support. The analysis leads to the conclusion that the scheme cannot withstand equal protection attack.

The first right—call it privilege or confidentiality—is cavalierly brushed aside by the majority. Yet it cannot be gainsaid that confidentiality is the bedrock upon which the attorney-client relationship rests. Confidentiality is of vital significance to the client who entrusts protection of his liberty, his fortune and his security to the counselor whom he consults. Confidentiality is of equal consequence in maintaining the professional stature and competence of the attorney whose advice has been

---

[2]Brokers are curiously undefined and their inclusion is mystifying. Does the statute encompass all brokers—real estate brokers, stock brokers, yacht brokers, pawnbrokers, insurance brokers, exchange brokers, et al.—or merely the most visible of the species? Since no brokers have appeared in this proceeding, we need not reach the question.

sought. Any statute which invades this essential characteristic of a profession is assuredly of significant importance to the individuals in the class.

Justice Story said it all a century and a half ago when he wrote, "Notwithstanding the sneers of ignorance, and the gibes of wit, no men are so constantly called upon in their practice to exemplify the duties of good faith, incorruptible virtue, and chivalric honor, as lawyers. To them is often entrusted the peace and repose, as well as the property, of whole families; and the slightest departure from professional secrecy, or professional integrity, might involve their clients in ruin." (Story, Story's Miscellaneous Writings (1835) p. 452.)

But, argues the Fair Political Practices Commission, an administrative procedure has been adopted to permit nondisclosure of the name of a private client of a public official in certain cases of privilege. (Cal. Admin. Code, tit. 2, § 18740.) It is a cumbersome, time-consuming process, involving a written presentation of specific facts by the public official, a ruling by the executive director of the commission, a review by the commission with notice to the Attorney General and the local district attorney and city attorney, followed by a second ruling in the form of a written commission opinion. The short answer is that nothing in the statute gives to an administrative agency any authority to circumscribe or limit in any manner the precise provisions of the act. Indeed, the statute emphatically provides that the statement of income *shall* contain the detailed material. Thus it is not surprising that the commission cites no case law to support its unique theory that an invalid statute can be rendered valid by the later promulgation of an administrative agency regulation.

The right of members of the class to seek and hold public office must also be considered. While under the act attorneys are not barred from holding office, they clearly suffer significant detriment. Although it may be argued that the discrimination is merely an indirect, psychological restraint or deterrent to the exercise of protected political and associational interests, I cannot agree that such a burden, even if subtle, is an inconsequential encumbrance on rights of citizenship.

In considering the extent to which the classification scheme impairs these interests, one must initially observe that the statute requires lawyers, like all other persons similarly situated, to identify sources of personal income. It discriminates against lawyers, however, in that the

amount triggering the reporting requirement for them is lower than for all other occupations save one. This discriminatory provision results in a greater relative infringement of lawyers' rights, since they must disclose all sources of income above $1,000 rather than only those above $10,000. While it is difficult to measure the impairment of attorneys' rights in absolute terms, in my view it is clear that the asserted state interest does not justify this relative impairment when considered in light of the importance of the rights at stake.

The purpose of the present statute is to obtain disclosure of financial interests material to the public decision-making process. To accomplish that purpose the act requires revelation not merely of the source of the attorney's income—his law practice—but the identity of his clients. This is justified, according to the commission, because the clients "present the greatest potential source of conflicting obligations."

If we assume arguendo that the fact a client pays a fee of $1,000 to a lawyer, who serves part-time on a local city council, creates a potential conflict of interest, can it be said that any less potential conflict is created by the patient who pays a $1,000 medical bill to his physician who also serves on the council, by the businessman who pays a $1,000 fee to his accountant, or by the builder who pays $1,000 to an architect or engineer for services rendered? If the physician-patient privilege is protected for fees under $10,000, can any justification be advanced for breaching the attorney-client privilege where an identical fee is involved?[3] I suggest no such state interest can be advanced, unless we are willing to indulge in the assumption that attorneys are more venal, more prone to divided loyalty, more oblivious to their public responsibilities or more likely to succumb to unethical financial practices, than physicians, accountants, architects, or engineers. Indeed, the commission implies this assumption when it argues in effect that a client's business or professional relationship with the attorney may give rise to opportunities for divided loyalties and a resulting potential for improper influence over the conduct of public affairs. No persuasive justification, however, has been advanced to so denigrate the legal profession.

---

[3]It cannot be doubted that the attorney-client privilege is involved in the mere payment of a legal fee, which may carry with it untoward implications. Certainly the town's leading businessman who consults the town's leading criminal lawyer and pays him a retainer expects the fact of the consultation and representation will not be disclosed. Under the statute confidentiality vanishes if the lawyer serves on the city council. Yet if the businessman consults a psychiatrist who also serves on the city council and pays him less than $10,000, the fact of the visits remains private. To a large segment of society, the implications of the two consultations are equally stigmatic.

The $1,000 threshold reporting requirement imposed upon lawyers is thus underinclusive, in that it omits other professions similarly situated and equally likely to exercise influence upon the processes of government. By the same token the statute is overinclusive, in that it imposes a more onerous quantitative reporting obligation on lawyers than on all other public officials who have private sources of income.

The legal profession has been subject to a withering barrage of irrational criticism in recent years from a wide spectrum of commentators. Because of this demagogic tendency to cast the lawyer in the role of the villain responsible for most of society's ills, the authors of the instant statute understandably yielded to the temptation to single out lawyers for discriminatory treatment. Although this result may be currently acceptable among those unfamiliar with the monumental contributions of lawyers to the development of our republic, such political or emotional motivation does not insulate this discriminatory statute from constitutional invalidation.

I do not find that the state's meager interest in support of the sensitive classification herein outweighs the important right of petitioner and those similarly situated to be free from discriminatory treatment. Accordingly, the section must be invalidated insofar as it provides a lower threshold reporting requirement for lawyers and brokers.

NEWMAN, J., Dissenting.—The majority opinion concedes that the record here is very thin as to "brokers". I think it is so thin that this court is not justified in negating the aims of the citizens who voted to approve the initiative measure with its broker requirements.

Regarding the initiative measure and lawyers, does not part C of the majority opinion, on equal protection, evoke memories of classical comments on law, logic, and experience? (E.g., Holmes, The Common Law (1881) p. 1; Radin, Law as Logic and Experience (1940) p. 161.) The "experience" here, I submit, at least balances the equal protection "logic." (See *A Legal Look at Congress and the State Legislatures* in Legal Institutions Today and Tomorrow (Paulsen edit. 1959) at pp. 67 and 69-73 ("Legislatures and Lawyers"); cf. *Fewer Lawyer-Legislators*, The Recorder (Nov. 8, 1979) p. 1.)

The State Bar of California, with proclaimedly watchful but beneficent guidance from this court, over many years has constructed a labyrinth of unique rules that purport to govern the legal profession.

Given the immense impact of that historically specialized and sometimes oligopsonistic treatment, I cannot agree with my colleagues that now we should invalidate the modest experiment that the voters have endorsed in this innovative financial-disclosure law for lawyers. (Cf. my dissents in *Merco Constr. Engineers, Inc.* v. *Municipal Court* (1978) 21 Cal.3d 724, 733 [147 Cal.Rptr. 631, 581 P.2d 636], and *Fair Political Practices Com.* v. *Superior Court* (1979) 25 Cal.3d 33, 50 [157 Cal.Rptr. 855, 599 P.2d 46].)

Bird, C. J., concurred.